**William BELK, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 560–84C.**

United States Claims Court.

July 22, 1987.

James H. Davis, with whom was Jonathan Udell, Los Angeles, Cal., for plaintiffs.

Terrence S. Hartman, with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant. Jose Alvarez, Dept. of State, of counsel.

## OPINION

SMITH, Chief Judge.

This matter is before the court on Defendant's Motion for Summary Judgment. This opinion elaborates upon an oral ruling given by the court at the close of argument on the motion. That ruling was based upon consideration of the parties' submissions and oral argument.

### Facts

The plaintiffs are 13 American hostages and two of their spouses. The hostages were held in Iran from November 4, 1979, until January 20, 1981, a period of 444 days. They allege that when the United States executed the Algerian Accords on January 19, 1981, it extinguished their causes of action against Iran, under Iranian law, international law, and the laws of the United States. These causes of action were for false imprisonment, assault and battery, intentional infliction of emotional distress, loss of consortium, and the invasion of other rights, immunities, and privileges. This signing of the Algerian Accords by the United States thus accom-

plished a taking of their property for a public purpose without just compensation. The Algerian Accords, consist of the Declarations of the government of the Democratic and Popular Republic of Algeria and undertakings of the United States of America and the Islamic Republic of Iran. Paragraph 11 of the Algerian Declaration bars United States nationals from prosecuting claims arising out of events occurring before the date of the Declaration and related to the seizure of the 52 United States nationals, their detention, and injuries to them or their properties.

The defendant for purposes of the motion has assumed the alleged causes of action against Iran constitute property, but argues the plaintiffs have not stated a cause of action for the taking of this property under the takings clause of the Fifth Amendment. The defendant has asserted two theories under which the plaintiffs' fail to state a cause of action: (1) the settlement of the plaintiffs' claims by the President did not constitute a taking of plaintiffs' property for a public purpose without just compensation, and (2) the plaintiffs cannot state a cause of action for the taking of their property based upon the President's settlement of their claims because such an action is not susceptible to judicial review.

### Discussion

#### 1. *Takings*

█ The takings clause of the Fifth Amendment prohibits the taking of property for public use, without just compensation. We must determine, whether or not, the alleged actions by the government in this case constitute a taking. The Supreme Court although unable to provide us with a specific formula to determine if a taking has occurred, *Penn Central Transportation Company v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), has identified several factors and cautioned that such a determination must be made on the particulars of each case. *Id.* The Claims Court listed these factors in *Shanghai Power Company v. United States,* 4 Cl.Ct. 237, 242 (1983), *aff'd mem.,* 765 F.2d 159 (Fed.Cir.1985),

*cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985).

Factors relevant to whether there has been a taking are the degree to which the property owner's rights were impaired, the extent to which the property owner is an incidental beneficiary of the governmental action, the importance of the public interest to be served, whether the exercise of governmental power can be characterized as novel and unexpected or falling within traditional boundaries, and whether the action substituted any rights or remedies for those that it destroyed. In determining whether a taking has occurred the court must weigh all of the relevant factors and decide whether compensation is required by principles of justice and fair play. *See Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979); *Deltona Corp. [v. U.S.],* 657 F.2d [1184] at 1191, 228 Ct.Cl. [476] at 488 [ (1981) ].

*Id.* at 242–43 (footnotes omitted).

Before discussing these factors, we should first look at the nature of the governmental action because a taking will more likely be found when a governmental action can be characterized as a physical invasion, rather than a program adjusting the benefits and burdens of economic life for the common good. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. The governmental action at issue is the President's power to conduct foreign relationships and does not involve a physical invasion or other direct appropriation of property, and therefore, as stated in *Penn Central* does not readily suggest a taking has occurred.

The plaintiffs argue there are triable issues of material fact for each of the *Shanghai Power* factors and the government's motion should be denied. Summary judgment is appropriate only when there are no issues of material fact in dispute and judgment is appropriate as a matter of law. *Weide v. United States,* 4 Cl.Ct. 432 (1984), *aff'd,* 765 F.2d 157 (Fed.Cir.1985), *cert. denied,* 474 U.S. 822, 106 S.Ct. 74, 88 L.Ed.2d 61 (1985). Further, all doubts relative to material facts in issue for the purposes of ruling on defendant's summary

judgment motion must be resolved against the defendant as the moving party. *South Louisiana Grain Services, Inc. v. United States*, 1 Cl.Ct. 281 (1982).

Plaintiffs concede that, "the president's power to espouse and settle claims of our nationals against foreign governments is of ancient origin and constitutes a well-established aspect of international law," *Shanghai Power*, 4 Cl.Ct. at 246, but argue with respect to the novelty factor that this does not preclude such action from constituting a taking. The plaintiffs contend that because summary judgment was denied in *E–Systems, Inc. v. United States*, 2 Cl.Ct. 271 (1983), which involved a taking claim based on governmental action, this raises a triable issue of fact regarding the novelty factor. Plaintiffs' reliance on *E–Systems* to support their argument is unfounded, since that case does not address the issue of novelty.

The facts surrounding this case bolster the argument that the governmental action was not novel or unexpected. The plaintiffs and their spouses were living in a country where the potential for kidnapping and other terrorist acts existed and the possibility that the United States would have to intervene was always present. The actions of the President should have been no surprise. "The possibility that the President will intervene in this matter is properly recognized as both a shared benefit and a shared risk of those who trade and travel abroad." *Shanghai Power* at 245. The compromise of plaintiffs' claims cannot constitute a drastic or novel interference with any investment-backed expectation.

The plaintiffs argue there is a factual dispute as to the degree to which the property owners rights are impaired. But the government admits in its proposed findings of uncontroverted facts that plaintiffs' alleged causes of action are totally barred; therefore, this is certainly not a factual dispute.

The plaintiffs further argue that although they received a benefit, there is a question as to whether they were the principal beneficiaries and a question as to whether or not the Accords were enforceable. The bargain struck by the President allowed the plaintiffs to leave Iran and avoid further harm. The bargain struck by the President also resolved a "source of friction" between two sovereigns. *Dames & Moore v. Regan*, 453 U.S. 654, 679, 101 S.Ct. 2972, 2986, 69 L.Ed.2d 918 (1981). Therefore, the plaintiffs benefitted directly in their role as hostages and indirectly in their role as Americans. The plaintiffs cannot now argue the legal issue of whether the Algerian Accords were enforceable and led to their release. The facts show the plaintiffs were released upon the execution of the Algerian Accords and this release was a very valuable benefit for the compromise of their claim. For this compromise they received their liberty and perhaps their lives. There is no doubt that if the President had put the question to the plaintiffs at the time of the negotiations, "Do you want to be released from Iran as of today or do you want to remain in captivity and preserve your right to sue Iran?", there wouldn't have been a millionth of a second pause on the part of the hostages or their spouses as to which they would choose.

Where a governmental action is intended to primarily benefit particular individuals, a taking has not occurred, even though there is an incidental benefit to the public. *National Bd. of Young Men's Christian Assn's v. United States*, 395 U.S. 85, 92, 89 S.Ct. 1511, 1515, 23 L.Ed.2d 117 (1969). The Presidential action which in this case inurred to the benefit of the individual and the sovereign does not result in a taking but rather in a sacrifice of a lesser right for the greater right of liberty. Based upon the undisputed facts, the court finds the plaintiffs to be the principal beneficiaries of the President's action although there was an incidental benefit to all Americans.

The relevant factors identified by the Supreme Court as applied to the facts set forth in plaintiffs' complaint do not require in the interests of "justice and fairness" that plaintiffs' receive compensation from the United States for the settlement of their claims against Iran. Plaintiffs' com-

plaint, therefore, fails to state a claim under the takings clause of the Fifth Amendment. While the hostages indisputedly have lost much, this "taking" was effectuated not by the United States, but by the government of Iran, which unfortunately recognizes no such civilized doctrine as is found in the American Constitution's commitment to just compensation. The American government should not be held as a surrogate for Iran's unjustifiable actions.

### 2. *Judicial Review of Presidential Action*

■ Since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the power of courts to review actions by Presidents and the Executive Branch has been a constant theme in American constitutional law. The tripartite nature of our Constitution's allocation of power, along with the ancient norm that free government is government under law, have lead to a complex pattern of case law and statute governing executive power and its relationship to judicial review. *E.g., United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). In the instant case there are two reasons for rejecting the contention that this Court may review whether the President's action of signing the Algerian Accords may amount to a Fifth Amendment taking. The first reason deals with whether the type of presidential decision at issue here lends itself to judicial resolution or is committed by the Constitution to the President for its ultimate resolution. The second reason deals with whether judicial review of the President's action in this case is consistent with the President's constitutional role as "the 'sole organ of the federal government in the field of international relations.' *United States v. Curtiss-Wright Corp., supra* [299 U.S. 304, at] p. 320 [57 S.Ct. 216, at p. 221, 81 L.Ed. 255 (1936)]." *United States v. Pink,* 315 U.S. 203, 229, 62 S.Ct. 552, 565, 86 L.Ed.2d 796 (1942).

### Justiciability

In *E–Systems, Inc.* the defendant argued that because the alleged taking was pursuant to the lawful exercise of the Presidential power to conduct foreign policy it is non-compensable but the court in dismissing this argument stated,

> Indeed, it is a prerequisite for a taking to be compensable under the Fifth Amendment that the action be pursuant to the exercise of lawful authority of some kind delegated to the executive ... There is no more persuasive reason why this should not apply in achieving a national purpose or benefit in the field of foreign policy than in the accomplishment of any other lawful national purpose or benefit.

2 Cl.Ct. at 275.

The court in *E–Systems, Inc.,* saw no reason for distinguishing between lawful presidential action in the area of foreign policy and lawful legislative action affecting solely national interests. However, there are two basic reasons why this court differs with the position reached in *E–Systems, Inc.* The first of these reasons involves the very nature of presidential decision making. Under our constitutional scheme, only certain kinds of decisions are committed to the judicial branch for resolution. Other types of decisions involve matters where the Congress and/or the President have the unique responsibilities to be the final arbiters. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) is the classic formulation of the criteria for which decisions are to be resolved by the judicial branch and which are not.

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for un-

questioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker,* 396 U.S. at 217, 82 S.Ct. at 710.

This court does not believe it has the authority " ... to enter upon policy determinations for which judicially manageable standards are lacking." *Baker,* 369 U.S. at 226, 82 S.Ct. at 715. This case involves a policy decision made by the President during a crisis situation and as Mr. Justice Frankfurter has stated:

A controlling factor in such cases is that, decision respecting these kinds of complex matters of policy being traditionally committed not to courts but to the political agencies of government for determination by criteria of political expediency, there exists no standard ascertainable by settled judicial experience or process by reference to which a political decision affecting the question at issue between the parties can be judged.

*Baker,* 369 U.S. at 282, 82 S.Ct. at 746 (Frankfurter, J., dissenting.)

### Foreign Policy Power

As to the second reason for disagreeing with *E–Systems, Inc., Shanghai Power* lays out a clear rationale as to why this particular type of presidential action should not be the subject of judicial inquiry.

A judicial inquiry into whether the President could have extracted a more generous settlement from another country would seriously interfere with his ability to carry on diplomatic relations. As the Supreme Court has recognized, secrecy lies at the very heart of the President's ability to conduct foreign relations. *Curtiss-Wright,* 299 U.S. at 320, 57 S.Ct. at 221. This principle was established by our first President when he refused a congressional request for information pertaining to the negotiations of the Jay Treaty of 1794. In words that are as timely today as when they were first written, President Washington responded as follows:

The nature of foreign negotiations requires caution, and their success must often depend on secrecy; and even when brought to a conclusion a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated would be extremely impolitic; for this might have a pernicious influence on future negotiations, or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers.

President's Message to the House of Representatives, Mar. 30, 1796, *reprinted in 1 Messages & Papers of the Presidents 1789–1897,* at 194–95 (J. Richardson ed. 1897).

Recognition of a cause of action for a fifth amendment taking on the basis of the President's settlement of a private claim would implicate many of these concerns.

4 Cl.Ct. at 248.

For the reasons stated, the plaintiffs cannot state a cause of action for the taking of their property based on the President's settlement of their claims because such an action is not susceptible to judicial review.

### Conclusion

Plaintiffs cannot state a claim for the taking of their property by the United States. Defendant's Motion for Summary Judgment is granted.

The Clerk is directed to dismiss the complaint. Each party will bear its own costs.