**SPERRY CORPORATION, et al., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 660–82C.**

United States Claims Court.

Aug. 5, 1987.

Alan Raywid, with whom was John D. Seiver, Washington, D.C., for plaintiff.

Stephen R. Bergenholtz, with whom were Asst. Atty. Gen., Richard K. Willard and Director, David M. Cohen, Washington, D.C., for defendant; Rochelle E. Stern, Dept. of Treasury and Ronald Kleinman, Dept. of State, of counsel.

## OPINION

SMITH, Chief Judge.

This matter is before the court on Defendant's Suggestion of Mootness. This opinion elaborates upon an oral ruling given by the court at the close of argument on that motion. That ruling was based upon consideration of the parties submissions and oral argument.

### Facts

The plaintiffs, Sperry Corporation and Sperry World Trade, Inc. (collectively "Sperry") are challenging the validity of the Iran Claims Act which was signed into law on August 16, 1985. It allowed the United States to deduct one and a half percent from any award of the Iran Claims Tribunal (Tribunal) of less than $5 million. One percent would be deducted from any amount recovered over $5 million. The deduction from the award was made retroactive to June 7, 1982. Thus, Sperry's award of $2.8 million, which was entered in September of 1982, was reduced by one and a half percent.

To understand the Iran Claims Act we must first look at the events leading up to its passage. In the late 1970's growing hostilities between the United States and the Islamic Republic of Iran resulted in a complete breakdown in relations between the two countries following the illegal detention of United States citizens by Iran. During this time, plaintiffs had various contracts with the Iranian government and many quasi-governmental bodies. These contracts dealt with leasing computer systems and performing data processing services. At the time of the hostage crisis, plaintiffs withdrew their personnel from Iran. They subsequently sued Iran and its instrumentalities in the United States District Court to recover a purported $18 million in damages. *Sperry Corp. v. Islamic Republic of Iran*, No. 80–1614 (D.D.C.). They obtained a prejudgment attachment on Iranian property located in the United States worth approximately $7 million.

On January 19, 1981, the United States entered into the Algiers Accords with Iran. The treaty was designed to end the 444 day hostage crisis and to alleviate the international crisis the Iranian revolution had caused. *See Belk v. United States*, 12 Cl.Ct. 732 (1987). In return for the release of American hostages, the United States agreed to suspend all pending litigation against Iran in United States courts, to terminate all attachments on Iranian property located in the United States and to transfer those assets back to Iran, in addition to other provisions not at issue here. The Tribunal was established in the Hague to adjudicate or otherwise dispose of outstanding claims and a security account was set up at the N.V. Settlement Bank in the Netherlands to hold Iranian funds that would be used to pay Tribunal awards. A fiscal reserve account was likewise set up by the United States at the Federal Reserve Bank of New York (FRBNY) to process awards to United States claimants.

United States claimants whose suits in federal courts were suspended by the Accords sued the government to prevent the implementation of the Accords. They charged that the terms of the compromise were beyond the President's statutory and constitutional authority and constituted a taking in violation of the Fifth Amendment. The Supreme Court, however, upheld the Accords in *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). Thus, any United States claimant wishing to pursue a claim against Iran was required to proceed through the Tribunal in the Hague.

Plaintiffs filed a claim with the Tribunal, entered into settlement negotiations with representatives of the Iranian government and settled their claims for $2.8 million on July 8, 1982. The settlement agreement was then submitted to the Tribunal and a

final judgement on that amount was entered in September of 1982. Funds in the amount of plaintiffs' award were transferred from the N.V. Settlement Bank to the FRBNY on October 29, 1982. Before plaintiffs were paid, however, the FRBNY deducted two percent from the award pursuant to a directive license issued by the Secretary of the Treasury on June 7, 1982. The government's justification for the fee was to cover costs expended by the departments of Treasury, State, and Justice in the Tribunal process. The fee was authorized by the Independent Offices Appropriations Act, 31 U.S.C. § 9701 (1982) (IOAA).

The plaintiffs brought suit in this court alleging that the directive license was improper. The court through former Chief Judge Kozinski found in a ruling from the bench, on May 1, 1985, that the fee schedule was not founded upon proper consideration of the problem but was, rather, a quickly devised attempt to charge a fee for use of the Tribunal. Judge Kozinski also found that the IOAA authorized only appropriation of funds for services provided by the appropriating agency. Thus, the fee schedule which sought to deduct fees for the use of the departments of Treasury, State and Justice was invalid.

Congress, apparently in response to this ruling, enacted the Iran Claims Act, which eventually became part of the Foreign Relations Authorization Act. *See generally* Act of August 16, 1985. Pub.L. No. 99–93, Title V, 1985 U.S.Code Cong. & Admin. News (99 Stat.) 437–39. It authorized the deduction of one and a half percent from the first $5 million of a Tribunal award and one percent from any amount greater than $5 million. It was made retroactive to June 7, 1982. *Id.* at § 502(d).

Since the court's holding of May 1, 1985 is now moot if the Iran Claims Act is upheld, the plaintiffs contend as follows: that the Act works a taking of private property for public use without just compensation in violation of the Fifth Amendment to the Constitution, that the Act denies them due process of law, that it violates the Origination Clause of the Constitution, and that its retroactivity is unconsti-

tutional. These contentions will each be addressed in turn.

### Taking

The plaintiffs argue that to the extent the deduction is not a tax it is a taking under the Fifth Amendment. The takings clause provides that private property shall not be taken for public use without just compensation. The defendant, however, contends that the deduction is not a taking under the Fifth Amendment. This court's decisions in *Belk v. United States,* 12 Cl.Ct. 732 (1987) and in *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237 (1983), *affd.,* 765 F.2d 159 (Fed.Cir.1985), *cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985) deal with the standards for determining whether a taking has occurred in the context of the exercise of the President's foreign policy powers. *Belk* concerned events at the core of the crisis involved in this case. The plaintiffs, thirteen American hostages and two of their spouses, alleged that when the United States executed the Accords it extinguished their causes of action against Iran for false imprisonment, assault and battery, etc., and therefore constituted a taking. *Shanghai Power* concerned President Carter's settlement of the plaintiff's $144 million claim against the Peoples Republic of China for about $20 million. In determining that there was not a taking in both cases we have laid out several factors. Of these factors, three are relevant and will each be discussed in determining the taking issue.

The first factor involves the degree to which a property holders rights can be impaired without working a taking. Here the plaintiffs contend that the one and a half percent deduction was a taking. The interest that the plaintiffs have is in the full amount of the award, which in this case is $2.8 million. From this award Congress has deducted one and a half percent to cover the government's expenses relating to the maintenance of the Tribunal. The degree of impairment here is very small. This is so in terms of either absolute dollars or percentages. Plaintiffs got the vast majority of their claim satisfied.

In the normal day-to-day regulatory activities of society much greater burdens are imposed upon the value of property affected by zoning laws or environmental regulations than the one and a half percentage charge here. *See generally Keystone Bituminous Coal Assn. v. DeBenedictis,* —— U.S. ——, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *Penn Central Transportation Company v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1983); *cf. Shanghai Power,* 4 Cl.Ct. at 239 (plaintiff's claim was compromised by the President from $144 million down to $20 million, a deduction in value of eighty-six percent.) As one of the benefits of civil society all property holders lose some value in their property with virtually every municipal regulation, tax or fee. But as Justice Holmes noted in *Pennsylvania Coal v. Mahon,* "(g)overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). While virtually every piece of real property would be considerably more valuable if no real estate taxes were ever imposed, it can hardly be argued under current case law that such real estate taxes work a taking.

The second relevant prong of the test laid out in the cases concerns the extent to which a property owner is an incidental beneficiary of governmental action. As recognized in *Dames & Moore,* the President could dissolve the attachment that plaintiffs had on Iranian property located in the United States without working a taking. 453 U.S. at 669–74, 101 S.Ct. at 2981–83. *Shanghai Power* also recognized the problems and risks inherent in doing business in a foreign country. 4 Cl.Ct. at 244–45. Generally, if a problem develops between a United States national and a foreign country, the United States national will have to proceed through the United States government to settle its claims. These claims are unlike ordinary causes of action in domestic law. Their ultimate value depends not upon some intrinsic merit or interpretation of fixed law, but upon the many exigencies of world politics and the Nation's security needs. Thus, in the absence of the establishment and maintenance of the Tribunal by the United States there may well have been no award for the plaintiffs at all. When the matter is examined in this light, it can be seen that Sperry significantly benefited from the Tribunal.

The third relevant prong of the test is whether or not the exercise of governmental power was novel or unexpected. Sperry argues that it did not have any expectations that the United States would deduct a fee from the settlement. In doing so Sperry cites language in the Algiers Accords which suggests that the cost of maintaining the Tribunal was to be borne equally by the United States and Iranian Governments. The court, however, finds that the cited language in the Algiers Accords was meant to delineate which portion of the cost would be borne by each side. It cannot be construed to be a promise, to United States claimants, that the government will bear the cost of maintaining the Tribunal.

Conversely, in support of its position that the deduction was neither novel and nor unexpected, the government cites the Foreign Claims Settlement Commission's (FCSC) five percent deduction from that Tribunal's awards. In the past when a national had a claim against a foreign country, the claim was settled pursuant to 22 U.S.C. §§ 1621–44m (1982). Under this system the United States collected a lump sum from the foreign country and then distributed it to its nationals with meritorious claims. Sperry is, however, not proceeding under the FCSC because the Iran Claims Tribunal was set up separately as a part of the hostage release settlement. In all other respects, though, Sperry's claims are analogous to claims made under FCSC. Since the FCSC includes a comparable deduction for services, it is not unreasonable to hold that Sperry should have expected the deductions at issue here. This is especially true in light of the fact that the United States has rarely, if ever, paid the cost of providing a forum for the settlement of its citizens claims against a foreign country. Thus, deductions from a settlement, arranged by the United States, with

a foreign country are not novel ideas, nor are they unexpected.

Sperry further claims that if the deduction is upheld, it, along with other United States nationals with claims against Iran, will have borne the cost of freeing the hostages. This is not true. Sperry assumed the risk of doing business in Iran and should not complain that it did not work out as planned. Sperry is, in effect, asking the taxpayers of the United States to bear a portion of Sperry's risk of doing business in a foreign country. The deduction is part of the cost of recovering its just claim. While this may work a theoretical anomaly, a violation of the theory of justice, it is a fact of the real world that justice is not a free good. No tort victim is ever made absolutely whole. No remedy ever exactly restores the injured.

■ In sum the plaintiffs' allegation that the deduction effectuated a taking does not hold up. The deduction is expressly established to cover the cost of maintaining the very forum that assures United State's nationals, like Sperry, recovery on meritorious claims.

### Due Process

The plaintiffs also attack the legislation on the grounds that it violates the equal protection of the laws and thus, is a denial of due process in violation of the Fifth Amendment[1]. The contention is that the deduction treats successful applicants differently than unsuccessful applicants. Unsuccessful applicants use the forum and consume valuable resources just as successful applicants do. However, successful applicants bear the cost of maintaining the Tribunal through the deduction, and unsuccessful applicants do not pay for the chance to litigate their claims.

To support their claim plaintiffs rely on the case of *Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966). In that case a prison inmate successfully challenged a state statute which required incarcerated felons to pay for the transcript on appeal, but, did not require a felon who was convicted but not incarcerated to pay for the transcript. Plaintiffs contend that the case stands for the proposition that a scheme of reimbursement which does not evenly charge such costs violates equal protection. *Id.* at 309, 86 S.Ct. at 1499. *Rinaldi* itself, though, can be used to uphold defendant's contention that the deduction does not contravene the equal protection of the laws. *Rinaldi* states that equal protection:

> imposes a requirement of some rationality in the nature of the class singled out. To be sure the constitutional demand is not a demand that a statute necessarily apply equally to all persons. 'The constitution does not require things which are different in fact.... to be treated in law as though they were the same.' *Tigner v. Texas*, 310 U.S. 141, 147 [60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940)].

384 U.S. at 308–09, 86 S.Ct. at 1499.

■ The factor distinguishing *Rinaldi* from the present case is that here all successful applicants with an award must pay the deduction. Unsuccessful applicants pay nothing. This in effect creates two different classes. The successful class and the unsuccessful class. All those within each class are treated equally. In *Rinaldi* the class constituted unsuccessful appellants who were irrationally broken down into those who were incarcerated and those who were not. Those who were incarcerated paid and those who were not incarcerated (but nevertheless found guilty) did not pay. This scheme was invidious as well as unsupported by any rational purpose.

In the present case, Congress, along with the State Department reasoned that to charge all users a more than nominal fee would discourage use of the Tribunal to settle American claims against Iran. *Iran Claims Legislation: Hearings on S.771 and S.1136 Before the Senate Committee on Foreign Relations*, 99th Cong., 1st Sess. 114 (1985) (State Department responses to additional questions submitted for the record). This suggests a rational basis for

---

1. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) found an equal protection component within the Fifth Amendment Due Process Clause.

charging successful claimants and not charging unsuccessful claimants.

### Origination Clause

■ The plaintiffs third major argument begins with the Origination Clause of the Constitution. According to plaintiffs' position, the Senate may amend or otherwise attach revenue raising amendments to a House bill which raises revenue, but, may not attach a revenue raising bill to a non-revenue raising House bill. This is a correct statement of the law as the court understands it. However, the plaintiffs make a fundamental mistake in the application of the Origination Clause to the facts of this case. The preliminary question to be answered is whether the Senate bill is the type of revenue raising bill which must originate in the House of Representatives.

The Origination Clause provides that: "All bills for raising revenue shall originate in the House of Representatives; but the Senate may propose and concur with amendments as on other bills." U.S. Const. art. 1, § 7, Cl. 1. The analysis of an Origination Clause problem is straightforward. The first question is whether the bill in question is revenue raising. In *Twin City Bank v. Nebeker*, 167 U.S. 196, 17 S.Ct. 766, 42 L.Ed. 134 (1897) the Supreme Court declined to define the phrase "bills for raising revenue" stating:

> What bills belong to that class is a question of such magnitude and importance that it is the part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject. It is sufficient in the present case to say that an act of Congress providing a national currency secured by a pledge of bonds of the United States, and which, in the furtherance of that object, and also to meet the expenses attending the execution of the act, imposed a tax on the notes in circulation ..., is clearly not a revenue bill which the Constitution declares must originate in the House of Representatives.

*Id.* at 202, 17 S.Ct. at 769.

The Court went on to quote Mr. Justice Story:

> the practical construction of the Constitution and the history of the origin of the constitutional provision in question proves that revenue bills are those that levy taxes in the strict sense of the word, and are not bills for other purposes which incidentally create revenue. 1 Story on Const. § 880.

*Id.* at 202–03, 17 S.Ct. at 769.

Thus, the Court has declared that only those bills which levy taxes in the strict sense of the word are revenue raising. The Supreme Court has defined "tax" as "a charge, a pecuniary burden, for the support of government." *United States v. Baltimore Railroad Co.*, 84 U.S. (17 Wall) 322, 326, 21 L.Ed. 597 (1872). The Supreme Court's statement in *Twin City Bank* that "there was no purpose ... to raise revenue to be applied in meeting the expenses or obligations of government" is consistent with this construction of the meaning of "tax". *Id.*

The law in question here is known as the Iran Claims Act. The Act was introduced into the Senate on May 17, 1985 by Senators Evans and Lugar to "promote the prompt and efficient processing of claims made by United States citizens and corporations against the government of Iran." 131 Cong.Rec. S6489–90 (Daily Ed. May 17, 1985) (Statement of Senator Evans.) The Iran Claims Settlement Act became part of the Foreign Relations Appropriations Act, 131 Cong.Rec. H6812 (Daily Ed. July 30, 1985). The purpose of the Foreign Relations Authorizations Act is to authorize appropriations for fiscal years 1986 and 1987 for the Department of State and various other agencies within the foreign relations field. *See generally* Pub.L. No. 99–93, 1985 U.S.Code Cong.Admin.News (99 Stat.) 405.

■ The Iran Claims Act was designed to provide a forum for United States nationals to litigate their claims against the government of Iran. To reasonably allocate the cost of maintaining the Tribunal, Congress enacted a one and a half percent charge to be applied against the monies awarded successful claimants. There can be no doubt that the act raises revenue.

The question is however, does it raise revenue in such a manner that it should have originated in the House rather than the Senate? The answer must be no. The purpose of the act is not to levy taxes in the strict sense of the word (i.e. to support the government) but to expedite the settlement of claims against Iran and to pass the cost of maintaining the Tribunal on to those who ultimately benefit most from it. Thus, any revenue raising is incidental to the purpose of the Act and therefore does not violate the Origination Clause.

### Retroactivity

The plaintiffs final attack on the constitutionality of the legislation involves the Due Process Clause of the Fifth Amendment. Plaintiffs state that the legislation as applied retroactively back to June 7, 1982 violates the Due Process Clause of the Fifth Amendment. This contention is fairly easily dealt with. It is well known that the courts will be extremely deferential to Congress where economic legislation is in controversy and will not overturn legislation unless it does not have any rational basis. *See Pension Benefit Guarantee Corp. v. R.A. Gray Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984). While this view has come under recent thoughtful criticism, *see generally* Economic Liberties and the Judiciary, 4 Cato Journal 661 (Winter 1985) it is at present the paradigm under which federal courts decide cases. *See generally United States v. Carolene Products Co.*, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). In *Pension Benefit* the Supreme Court upheld legislation which retroactively created liability for employers who dropped their pension plans. Congress found that without the legislation many companies would have withdrawn from their pension plans. The Court held that this was a rational basis.

▇ This is a considerably easier case. Here Congress has found that it would be unfair to place the burden of maintaining

the Tribunal solely on those who were not fortunate enough to have their claims heard early, especially in light of the arbitrary manner in which claims were heard. Congress also found that in the absence of retroactivity those with small claims would bear an undue burden because of the Iranian government's insistence on hearing the larger claims first. *Iran Claims Legislation: Hearings on* S.771 and S.1166 *Before the Senate Committee on Foreign Relations*, 99th Cong. 1st Sess. 120 (1985) (State Department responses to additional questions submitted for the record).

Plaintiffs finally contend that the legislation cannot be applied retroactively since they had no notice. The plaintiff in *Pension Benefit* made the same argument. The Court did not answer the question of whether notice was constitutionally compelled. The Court did, however, answer plaintiffs' assertion by assuming that notice was compelled and then suggested that plaintiff had notice under ERISA and from the various legislative proposals debated by the Congress. This is analogous to the present case in that Congress had at various times considered legislation authorizing a deduction, *Id.* and the Foreign Claims Settlement Commission had previously used a five percent charge much like the smaller one and a half percent deduction in question here. 22 U.S.C. § 1626(b) (1982).

As long as Congress has some reason for enacting legislation, it will be considered rationally based. *Pension Benefit*, 104 S.Ct. at 2718. Here, Congress had valid reasons to enact the legislation and did not act in a purely arbitrary manner when making it retroactive.

### Conclusion

The court concludes that Title V of the Foreign Relations Authorization Act is constitutional. Thus, the prior decision of the Claims Court in the plaintiffs favor is moot. The Clerk is directed to dismiss plaintiffs' claims. Each side is to bear its own costs.