# United States Court of Appeals
# for the Federal Circuit

_____

**ALEXANDER ALIMANESTIANU, IOANA
ALIMANESTIANU, INDIVIDUALLY AND AS
EXECUTRIX OF THE ESTATE OF MIHAI
ALIMANESTIANU, IRINA ALIMANESTIANU,
JOANNA ALIMANESTIANU, KATHY
ALIMANESTIANU, EXECUTRIX OF THE ESTATE
OF SERBAN ALIMANESTIANU, NICHOLAS
ALIMANESTIANU, PAULINE ALIMANESTIANU,
EXECUTRIX OF THE ESTATE OF CONSTANTIN
ALIMANESTIANU, SIMONE DESIDERIO,
EXECUTRIX OF THE ESTATE OF CALIN
ALIMANESTIANU,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2017-1667

_____

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00704-MCW, Judge Mary Ellen Coster Williams.

_____

Decided: May 7, 2018

_____

JESSE TRAVIS CONAN, Becker, Glynn, Muffly, Chassin & Hosinski LLP, New York, NY, argued for plaintiffs-appellants. Also represented by RICHARD NILES CHASSIN.

LOREN MISHA PREHEIM, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by CHAD A. READLER, ROBERT E. KIRSCHMAN, JR., REGINALD T. BLADES, JR., ALEXANDER ORLANDO CANIZARES, ALISON VICKS.

―――――――――――

Before PROST, *Chief Judge,* CLEVENGER and LINN, *Circuit Judges.*

CLEVENGER, *Circuit Judge.*

Members of the Alimanestianu family ("Appellants"), who are U.S. nationals, appeal the final decision of the United States Court of Federal Claims ("the trial court"), which denied their claim that the United States Government committed a taking of their property by espousing their district court claims and vacating their judgment. *Alimanestianu v. United States*, 130 Fed. Cl. 137 (2016). On appeal, Appellants argue that the Government's actions constituted a compensable *per se* taking, and that the Supreme Court decision in *Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015), overruled this court's governing precedent and mandates payment of just compensation in this case. We disagree, and affirm the trial court's ruling.

## BACKGROUND

Mihai Alimanestianu, a U.S. citizen, was killed in the bombing of UTA Flight 772 by terrorists of the Abu Nidal Organization ("ANO") in 1989. The United States Department of State determined that the Libyan government sponsored the bombing by providing considerable support to ANO, including providing a safe haven, train-

ing, logistical assistance, and monetary support. At the time of the bombing, Libya enjoyed sovereign immunity from suit in the United States pursuant to the Foreign Sovereign Immunities Act ("FSIA"). But in 1996, Congress amended the FSIA to permit claims for money damages for personal injury or death caused by acts of foreign sovereigns designated as state sponsors of terrorism. 28 U.S.C. § 1605(a)(7) (1996). Libya had been designated as such a foreign sovereign by the Department of State as of December 29, 1979. As a result of the 1996 amendment to FSIA, Libya lost its immunity to suit in the United States.

In 2002, Appellants joined the families of other U.S. victims of the bombing, and filed an action against the Libyan government and six high-ranking Libyan officials ("the Defendants") in the United States District Court for the District of Columbia. Compl., *Pugh v. Socialist People's Libyan Arab Jamahiriya*, No. 1:02-cv-02026 (D.D.C. Oct. 16, 2002), ECF No. 1 ("*Pugh*"). The complaint asserted various state and federal common law and statutory claims against the Defendants. Am. Compl., *Pugh* (D.D.C. May 19, 2006), ECF No. 57. The Defendants appeared before the district court, and the court subsequently granted summary judgment in favor of the plaintiffs, entering final judgment on August 8, 2008. Order, *Pugh* (D.D.C. Aug. 8, 2008), ECF No. 152 (re-entering the Order, *Pugh* (D.D.C. Feb. 7, 2008), ECF No. 96, which amended the Judgment, *Pugh* (D.D.C. Jan. 24, 2008), ECF No. 93). The damages award for all plaintiffs totaled $6.9 billion, while Appellants received approximately $1.297 billion. Judgment, *Pugh*, ECF No. 93. Each of the Appellants received a multi-million dollar award, including: Mihai's estate; Mihai's wife, Ioana; Mihai's children, Joanna, Nicholas, Irina, and Alex; and the estates of Mihai's brothers, Calin, Serbin, and Constantin. *Id.*

The Defendants appealed six days after judgment, Notice of Appeal, *Pugh* (D.D.C. Aug. 14, 2008), ECF No.

156, but that same day, the United States entered into a Claims Settlement Agreement with the Libyan government. Claims Settlement Agreement Between the United States of America and The Great Socialist People's Libyan Arab Jamahiriya, Lb.-U.S., Aug. 14, 2008, T.I.A.S. No. 08-814 ("Claims Settlement Agreement"). As part of the Claims Settlement Agreement, Libya agreed to deposit $1.5 billion into a humanitarian fund, *id.* at 4, $681 million of which was "to ensure the fair compensation for the claims of nationals of the United States for wrongful death or physical injury in those cases described in the Act which were pending against Libya . . . as well as other terrorism-related claims against Libya." Certification Under Sec. 5(A)(2) of the Libyan Claims Resolution Act Relating to the Receipt of Funds for Settlement of Claims Against Libya, U.S. DEP'T OF STATE, 2 (Oct. 31, 2008) ("Certification"); *see also* Dep't of State Pub. Notice 6476, 74 Fed. Reg. 845 (Jan. 8, 2009). Each country agreed that the deposit would constitute "a full and final settlement of its claims and suits and those of its nationals," Certification at 2, and each party would be required to "[s]ecure . . . the termination of any suits pending in its courts . . . (including proceedings to secure and enforce court judgments) . . . preclude any new suits in its courts," and restore "sovereign, diplomatic, and official immunity to the other Party . . . ." Claims Settlement Agreement, at 2. Congress codified the Claims Settlement Agreement through the Libyan Claims Resolution Act ("LCRA"), providing that, upon receipt of the funds pursuant to the Claims Settlement Agreement, Libya's sovereign immunity would be restored. 28 U.S.C. § 1605A note, Pub. L. No. 110-301, 122 Stat. 2999 (2008).

On October 31, 2008, the Secretary of State certified receipt of the Libyan funds, Certification at 2, thereby restoring Libya's sovereign immunity under the FSIA, pursuant to the LCRA. President George W. Bush also issued an Executive Order, providing that any pending

suit by U.S. nationals, "including any suit with a judgment that is still subject to appeal . . . shall be terminated." Exec. Order No. 13,477 § 1(a)(ii), 3 C.F.R. 13447, 73 Fed. Reg. 65965 (2008). The Foreign Claims Settlement Commission ("the Commission")[1] retained jurisdiction to adjudicate and render final decisions over claims of U.S. nationals referred to the Commission by the Secretary of State. 22 U.S.C. § 1623(a)(1)(C) (1998). Once implemented, the Settlement Agreement both closed the doors of U.S. courts to suits against Libya (thus requiring Appellants' suit against Libya to be dismissed) and espoused the existing claims of U.S. citizens against Libya (thereby substituting the United States for the Appellants as plaintiffs in the espoused claims against Libya).

While Appellants' district court claims and judgment were on appeal, the United States filed a "motion to intervene, vacate judgment, and dismiss [the Appellants'] suit with prejudice," arguing that, pursuant to the Claims Settlement Agreement, LCRA, and Executive Order 13,477, U.S. courts no longer had jurisdiction over terrorism-related claims against Libya. U.S. Mot. to Intervene, Vacate J., and Dismiss Suit with Prejudice at 1, 11–16, *Pugh v. Socialist People's Libyan Arab Jamahiriya* (Nos. 08-5387, 08-5388), (D.C. Cir. Jan. 9, 2009), ECF No. 162-1

---

[1] The Commission is a quasi-judicial, independent agency within the Department of Justice which adjudicates claims of U.S. nationals against foreign governments pursuant to international claims settlement agreements or at the request of the Secretary of State. *See* Int'l Claims Settlement Act, 22 U.S.C. § 1621 *et seq.*, and War Claims Act, 50 U.S.C. App'x §§ 2001–2007. The Commission was established in 1954, *see* Reorg. Plan No. 1 of 1954, 5 U.S.C. App'x, when it assumed the functions of two predecessor agencies: The War Claims Commission and the International Claims Commission.

("*Pugh II*").  In its motion, the Government stated that it had "espoused the terrorism-related claims of U.S. nationals against Libya, including plaintiffs' claims," and "made the plaintiffs' claims its own."  *Id.* at 15.  The United States Court of Appeals for the District of Columbia Circuit granted the Government's motion, vacated judgment, and directed the district court to dismiss the case.  *Pugh II*, 2009 WL 10461206, at *1 (D.C. Cir. Feb. 27, 2009) (per curiam).  The district court dismissed the case shortly thereafter.  Order, *Pugh* (D.D.C. Mar. 9, 2009), ECF No. 163.

As for the proceedings before the Commission, the State Department recommended an award of $10 million be paid to the estates of individuals who died as a result of the bombing, and Mihai's estate received $10 million.  Final Decision at 2, LIB-II-047 (Foreign Claims Settlement Comm'n May 16, 2012) ("2012 Final Decision").  The State Department also established seven additional categories of claims for referral to the Commission.  Letter from the Hon. John B. Bellinger, III, Legal Adviser, Dep't of State, to the Hon. Mauricio J. Tamargo, Chairman, Foreign Claims Settlement Comm'n (Jan. 15, 2009).  Appellants brought additional claims under one category for the "mental pain and anguish" of claimants who were both U.S. nationals and relatives of the decedent and who had pending claims against Libya that were dismissed.  *Id.*; Compl., *Alimanestianu v. United States*, No. 1:14-cv-00704, at 8, ¶ 37 (Fed. Cl. Aug. 4, 2014), ECF No. 1 ("Complaint").[2]  The Commission determined that each of Mihai's children should receive $200,000 under this category of recovery, but denied recovery to Mihai's wife,

---

[2]    Commission decisions that grant awards remove all personally identifiable information.  Therefore, support for Appellants' awards may be found in Appellants' complaint before the trial court.

being the beneficiary of Mihai's estate, and the estates of Mihai's brothers, because they were deceased.  Complaint at 8, ¶ 37.

Dissatisfied with the relief granted by the Commission, Appellants initiated a Fifth Amendment takings case against the Government in the Court of Federal Claims.  Appellants alleged that the Government effected a *per se* taking by espousing their district court claims and vacating their judgment against Libya.  Their claim demanded the Government pay over $1.286 billion—the difference between their district court judgment and the Commission's award—in just compensation.

The trial court denied their claim.  When faced with cross-motions for summary judgment, the court determined that the categorical requirement to pay just compensation in *per se* takings did not apply to cases where the Government espouses claims against foreign sovereigns.  *Alimanestianu*, 130 Fed. Cl. at 144.  Instead, the trial court found our holding in *Abrahim-Youri v. United States*, 139 F.3d 1462 (Fed Cir. 1997), *cert. denied sub nom. Gurney v. United States*, 524 U.S. 941 (1998), controlled, and analyzed Appellants' claims under the regulatory taking framework.  *Alimanestianu*, 130 Fed. Cl. at 144.  Using this framework, the trial court found Appellants had no reasonable expectation to recover their nonfinal judgment against Libya because, at the time of injury, Libya maintained sovereign immunity and any potential recovery would be speculative.  *Id*. at 144–45.  The trial court then discussed the Government's paramount right to conduct foreign affairs and "concomitant right to compromise its nationals' claims in the process." *Id*. at 145.  And finally, the trial court found there was no dispositive economic impact of the Government's conduct, because Appellants received over $10 million that they likely would not otherwise have had.  *Id*. at 145–46. With all of the regulatory takings factors weighing in favor of the Government, the trial court concluded there was no

compensable taking and granted summary judgment in favor of the Government.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3) (2012).

## DISCUSSION

We review the trial court's grant of summary judgment *de novo, Nw. Title Agency, Inc. v. United States*, 855 F.3d 1344, 1347 (Fed. Cir. 2017) (citing *TEG-Paradigm Environmental., Inc. v. United States*, 465 F.3d 1329, 1336 (Fed. Cir. 2006)), applying the same standard as the trial court, *Palahnuk v. United States*, 475 F.3d 1380, 1382 (Fed. Cir. 2007). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Nw. Title*, 855 F.3d at 1347 (citing *Castle v. United States*, 301 F.3d 1328, 1336 (Fed. Cir. 2002)).

"Whether a taking has occurred is a question of law based on factual underpinnings. We conduct a plenary review of the legal conclusions of the [the trial court] while reviewing its factual conclusions for clear error." *Stearns Co. v. United States*, 396 F.3d 1354, 1357 (Fed. Cir. 2005) (internal citations and quotations omitted), *cert. denied*, 546 U.S. 875 (2005). In the context of summary judgment, all factual inferences should be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

## I

The Fifth Amendment prohibits the taking of "private property . . . for public use, without just compensation." U.S. CONST. amend. V, cl. 4. To state a claim for a taking, Appellants must establish: (1) that they had a cognizable property interest, and (2) that their property was taken by the United States for a public purpose. *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir.

2009).  We assume, without deciding, that Appellants had a cognizable property interest in their district court claims and non-final judgment.  Thus, we must decide only whether the Government's actions constituted a taking.  We hold that, even if Appellants have a property interest in their claims and non-final judgment, no compensable taking occurred under the Fifth Amendment.

Takings claims typically come in two forms: *per se* or regulatory.  A *per se* taking involves the appropriation of private property, including both real, *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 427 (1982), and personal, *Horne*, 135 S. Ct. at 2426.  To find a *per se* taking, there must be either a permanent physical invasion, *Loretto*, 458 U.S. at 426, or a denial of all economically viable uses of the property, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992).  When the Government commits a *per se* taking, it has a categorical duty to pay just compensation.  *Horne*, 135 S. Ct. at 2426.

A regulatory taking involves a "restriction on the use of property that [goes] 'too far.'"  *Id.* at 2427 (quoting *Pa. Coal Co. v. Mahon,* 260 U.S. 393 (1922)).  To determine whether a Government action goes "too far," courts have traditionally utilized a three-pronged factual inquiry illuminated by *Penn Central Transportation Co. v. City of New York*, which looks to: "the character of the governmental action," "the extent to which the regulation has interfered with distinct investment-backed expectations," and "[t]he economic impact of the regulation on the claimant." 438 U.S. 104, 124 (1978).

Since at least 1799, the President has exercised his constitutional authority to espouse and settle claims of U.S. citizens against foreign governments.  *See Dames & Moore v. Regan*, 453 U.S. 654, 679 n.8 (1981); *Shanghai Power Co. v. United States*, 4 Cl. Ct. 237, 243–45 (1983), *aff'd mem.*, 765 F.2d 159 (Fed. Cir. 1985), *cert. denied* 474 U.S. 909 (1985) (discussing the history of claim es-

pousal). We have previously recognized that when claims are espoused and settled by the Government, they are effectively extinguished, rather than merely regulated. Our two leading cases involving governmental espousal of claims against foreign governments are *Belk v. United States*, 858 F.2d 706 (Fed. Cir. 1988) and *Abrahim-Youri.*

Both cases arose as a result of the Iranian hostage crisis of 1979–81, where U.S. citizens were held captive in the U.S. embassy in Tehran. *Belk*, 858 F.2d at 707; *Abrahim-Youri*, 139 F.3d at 1463. In *Belk*, we were asked whether the Government committed a compensable taking by entering the Algiers Accords, which espoused the claims of U.S. nationals against the Iranian government, thus extinguishing their right to sue Iran for damages done to them by captivity. *Belk*, 858 F.2d at 707–08; *see Belk v. United States*, 12 Cl. Ct. 732, 734 (1987).

*Belk* thus presented this court with the need to apply a test by which to measure the claim that the Government had caused a compensable taking of private property by espousing the plaintiffs' claims against Iran. The court turned to the Supreme Court's analysis of takings law as explicated in *Penn Central*. Before composing the well-known three-part test for assessing regulatory takings, the Supreme Court observed that whether a compensable taking has occurred largely depends on the circumstances of a particular case. *Penn Central*, 438 U.S. at 124 (citing *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168 (1958), and *United States v. Caltex, Inc.*, 344 U.S. 149, 156 (1952)). Understanding the fundamental difference between the circumstances of the case at hand and a typical domestic regulation, but respecting the three-part test in *Penn Central* for domestic regulatory takings, the *Belk* court observed that the takings analysis in the espousal setting should be approached with the following in mind:

the degree to which the property owner's rights were impaired, the extent to which the property owner is an incidental beneficiary of the governmental action, the importance of the public interest to be served, whether the exercise of governmental power can be characterized as novel and unexpected or falling within traditional boundaries, and whether the action substituted any rights or remedies for those that it destroyed.

*Belk*, 858 F.2d at 709 (citations omitted).

*Belk* described the foregoing considerations as an "explication, reflecting the unusual facts of this case" of the three-part *Penn Central* test: "the character of the government action, its economic impact, and its interference with reasonable investment expectations." *Id.* (citing *United States v. One (1) 1979 Cadillac Coupe de Ville*, 833 F.2d 994, 1000 (Fed. Cir. 1987)).

The court then determined that espousing a citizen's claim in the U.S. courts was not a "physical invasion" traditionally associated with *per se* takings, but rather was "the prohibition on the assertion by the appellants of their alleged damage claims against Iran." *Id.* We applied the *Penn Central* factors and found that, given the President's overwhelming authority in maintaining foreign relations, and the fact that claimants were the intended beneficiaries of the Algiers Accords and lacked any investment-backed expectations, the claimants did not suffer a compensable taking. *Id.* at 709–10.

The present case finds an even closer factual analog in *Abrahim-Youri*. After the Algiers Accords were entered into, numerous outstanding claims remained between U.S. nationals and Iran. *Abrahim-Youri*, 139 F.3d at 1464. The United States and Iran subsequently entered a Settlement Agreement, where the United States espoused and settled all of the claims of its citizens in exchange for a lump-sum payment from Iran. *Id.* Like the present

case, Congress granted the Commission jurisdiction to adjudicate and distribute awards from the lump-sum to those who had their federal claims espoused. *Id.* When the fund was unable to satisfy the claims, some of those claimants brought an action against the Government, alleging that the initial espousal of their claims constituted a *per se* taking. *Id.* at 1464–65. This court noted that, while the Government's actions shared some features of a *per se* taking, the *Penn Central* factors remained relevant to the takings inquiry in this limited context. *Id.* at 1465–66. As in *Belk*, the *Abrahim-Youri* court affirmed the judgment of no compensable taking. *Id.* at 1468.

The question for us, then, is whether the Supreme Court's decision in *Horne* overruled our existing body of law. We cannot now say that *Horne* requires a different result than we reached in *Belk* and *Abrahim-Youri*. *Horne* involved the Agricultural Marketing Agreement Act of 1937, which enabled the Secretary of Agriculture to promulgate marketing orders to regulate particular agricultural product markets. 135 S. Ct. at 2424. One order involving the raisin industry required growers to turn over title to a percentage of their crops to the Raisin Committee as part of a reserve requirement, without any compensation. *Id.* The Committee would then dispose of the reserved raisins as it deemed necessary, and distribute a portion of any proceeds back to the growers. *Id.* A family of raisin growers and handlers sued the Government, arguing the reserve requirement was an unconstitutional taking. *Id.* at 2424–25.

The Supreme Court began its analysis by noting that when the Government directly appropriates real or personal property for its own use, "such an appropriation is a *per se* taking that requires just compensation." *Id.* at 2425–26. The Court went further, however, stating that the "physical *appropriation* of property [gives] rise to a *per se* taking, without regard to other factors." *Id.* at 2427. It is this statement upon which Appellants rely. If

their claims and non-final judgment constitute cognizable property, and the Government entirely appropriated that property by entering and ratifying the Libyan Claims Settlement Agreement, then Appellants argue that *Horne* mandates the Government pay just compensation, without any consideration of the *Penn Central* factors.

But we have consistently held that prohibiting or espousing a litigant's claims by restoring a foreign sovereign's legal immunity is not a physical invasion of property. *See Aviation & Gen. Ins. Co. v. United States*, 882 F.3d 1088, 1097 (Fed. Cir. 2018) ("While we recognize the significant degree to which the Appellants' rights in maintaining their lawsuits were impaired—indeed, their lawsuits were terminated—the Government's action nonetheless was not a physical invasion of Appellants' property rights. Rather, the Government reinstated Libya's sovereign immunity for the common good . . . ."); *Belk*, 858 F.2d at 709 ("Here there was no physical invasion of property, but only the prohibition on the assertion by the appellants of their alleged damage claims . . . ."). Further, *Horne* addressed the physical invasion and categorical appropriation of entirely domestic, tangible property. 135 S. Ct. at 2429. The Supreme Court was not faced in *Horne* with events that involved the Government's plenary authority over foreign policy, or property entangled with international considerations. *See Dames & Moore*, 453 U.S. at 679 ("[T]he United States has repeatedly exercised its sovereign authority to settle the claims of its nationals against foreign countries . . . [where] the President has agreed to renounce or extinguish claims of United States nationals against foreign governments in return for lump-sum payments or the establishment of arbitration procedures."). This additional and quite substantial consideration supports our view that the *Penn Central* factors remain relevant to the takings inquiry in cases where the Government espouses its citizens' claims against foreign sovereigns. In

short, without speaking to the Constitutional issues at play in these types of cases, we do not read *Horne* to have undermined our law set forth in *Belk* and *Abrahim-Youri*.

We now consider the *Penn Central* factors to see if Appellants suffered a compensable taking. Looking to the character of the governmental action, Appellants provided no evidence that this factor should weigh in their favor. As the trial court noted, the Executive has an overwhelming interest in conducting foreign affairs. *Alimanestianu*, 130 Fed. Cl. at 145. "Not infrequently in affairs between nations, outstanding claims by nationals of one country against the government of another country are 'sources of friction' between the two sovereigns . . . [where] nations have often entered into agreements settling the claims of their respective nationals." *Dames & Moore*, 453 U.S. at 679. "[T]he United States has repeatedly exercised its sovereign authority to settle the claims of its nationals against foreign countries," whether it be by treaty or through executive action, and "Congress has implicitly approved th[is] practice." *Id.* at 679–80. Thus, the trial court correctly observed that the Government was working well within its Constitutional prerogative in conducting foreign affairs when it espoused and settled Appellants' claims.

As for the extent to which the regulation has interfered with distinct investment-backed expectations, Appellants have provided no evidence that they had an investment-backed expectation in their claims and non-final judgment. First, as *Abrahim-Youri* points out, "those who engage in international commerce must be aware that international relations sometimes become strained, and that governments engage in a variety of activities designed to maintain a degree of international amity." 139 F.3d at 1468. Further, the claims at issue were based on a "tenuous jurisdictional grant," *Alimanestianu*, 130 Fed. Cl. at 145—the State Sponsor of Terrorism exception to FSIA and the government's designation

of Libya as a state-sponsor of terrorism—which was always subject to the ever-evolving relationship between the two nations, *see Republic of Iraq v. Beaty*, 556 U.S. 848, 864–65 (2009) (noting that the state of foreign sovereign immunity "reflects current political realities and relationships . . . [which] generally is not something on which parties can rely in shaping their primary conduct," and that "[t]he President's elimination of Iraq's later subjection to suit could hardly have deprived respondents of any expectation they held at the time of their injury that they would be able to sue Iraq in United States courts" (internal quotations omitted)). Furthermore, any recovery by Appellants of their judgment would depend on a cooperative Libyan court ordering its government to pay the judgment, or failing such cooperation, a coercive act against Libya by some other governmental body to compel Libyan satisfaction of the judgment. However, Appellants do not provide any evidence that such efforts have been successful in the past, or would have been successful in this case. Thus, the trial court did not err by concluding that such recovery was speculative, and that espousal did not interfere overall with any investment-backed expectation in Appellants' claims and non-final judgment.

Finally, addressing the economic impact of the regulation on the claimant, the only evidence Appellants provide is that the Commission's award was less than their non-final judgment. But this evidence in no way disputes the trial court's observation that Appellants still received more than they would have without the Government's action. *Alimanestianu*, 130 Fed. Cl. at 145–46. As noted by the trial court, Mihai's estate received $10 million, and each of Mihai's children received $200,000 through the Commission, which is likely more than could have been expected had Appellants attempted to enforce any U.S.

judgment themselves.[3]  *Id.*   Instead, "the Government provided an alternative [adjudicatory forum] tailored to the circumstances which produced a result as favorable to the [Appellants] as could reasonably be expected." *Abrahim-Youri*, 139 F.3d at 1468.   Thus, "[w]here, as here, the private party is the particular intended beneficiary of the governmental activity, fairness and justice do not require that losses which may result from that activity be borne by the public as a whole, even though the activity may also be intended incidentally to benefit the public." *Belk*, 858 F.2d at 709 (internal quotations omitted).   "[T]he fact that [Appellants] are not satisfied with the settlement negotiated by the Government on their behalf does not entitle them to compensation by the United States." *Abrahim-Youri*, 139 F.3d at 1468.   Upon considering the *Penn Central* factors, Appellants have failed to show any evidence to demonstrate that they suffered a compensable taking.   Therefore, the trial court did not err by granting summary judgment in favor of the Government.

## AFFIRMED

### COSTS

No costs.

---

[3]     While this court acknowledges that the estates of Mihai's brothers were denied recovery before the Commission, arguably tipping the balance of the third factor in favor of those Appellants, "the question of whether Appellants were entitled to proceeds from the Libya Claims Settlement Agreement presents a nonjusticiable political question." *Aviation*, 882 F.3d at 1094.   Therefore, we cannot reach the question of whether those Appellants should have recovered under the Agreement.