# United States Court of Appeals for the Federal Circuit

---

**AVIATION & GENERAL INSURANCE COMPANY, LTD., NEW YORK MARINE AND GENERAL INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYDS LONDON, AUREUS ASSET MANAGERS, LTD., RIVERSTONE INSURANCE (UK), LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2016-2389, 2016-2402

---

Appeals from the United States Court of Federal Claims in Nos. 1:14-cv-00687-TCW, 1:14-cv-00703-TCW, Judge Thomas C. Wheeler.

---

Decided: February 12, 2018

---

STEVEN ROBERT PERLES, Perles Law Firm, PC, Washington, DC, argued for plaintiffs-appellants. Also represented by EDWARD BRIAN MACALLISTER, JOSHUA PERLES.

LOREN MISHA PREHEIM, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.

Also represented by REGINALD T. BLADES, JR., ROBERT E. KIRSCHMAN, JR., BENJAMIN C. MIZER.

––––––––––––––––––

Before MOORE, REYNA, and STOLL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* STOLL.

Opinion concurring in part, dissenting in part filed by *Circuit Judge* REYNA.

STOLL, *Circuit Judge*.

Appellants are insurance and asset management entities that paid property damage and personal injury claims arising from two terrorist events sponsored by Libya in the 1980s. Following the suspension of Libya's sovereign immunity pursuant to the passage of the State Sponsors of Terrorism Exception to the Foreign Sovereign Immunities Act in 1996 and the National Defense Authorization Act in 2008, Appellants filed lawsuits against Libya in federal court, asserting their subrogation rights for claims paid as a result of the attacks. Those lawsuits were ultimately terminated following Congress's passage of the Libyan Claims Resolution Act in 2008, which restored Libya's sovereign immunity and implemented a Claims Settlement Agreement between the United States and Libya. Subsequently, President George W. Bush signed Executive Order No. 13,477, which provided that any pending suit in any U.S. court filed by United States or foreign nationals relating to Libyan-sponsored terrorism shall be terminated.

In this takings case, we must decide whether the Government's termination of Appellants' lawsuits pursuant to the Claims Settlement Agreement between the United States and Libya and its subsequent legislation and executive order constituted a compensable taking under the Fifth Amendment. For the reasons below, we hold that it does not and affirm the Court of Federal Claims.

BACKGROUND

On November 23, 1985, EgyptAir Flight 648 was scheduled to travel from Athens, Greece to Cairo, Egypt before it was hijacked by terrorists of the Abu Nidal Organization ("ANO"). The hijacking and its aftermath resulted in the killing of passengers and the destruction of the aircraft hull. The United States Department of State determined that ANO received considerable support from the Libyan government, which provided safe haven, training, logistical assistance, and monetary support.

In a related event, on December 21, 1988, an agent of the Libyan Intelligence Service detonated explosives concealed in the luggage compartment of Pan Am Flight 103 as it crossed Scotland. The bombing killed all 243 passengers, including Americans, 16 crewmembers, and 11 bystanders, and destroyed the aircraft. The terrorist was acting as an agent of the Libyan government, which materially supported the attack by providing intelligence agents and equipping the terrorist with explosives and the equipment needed to detonate them.

At the time of the attacks, Libya enjoyed sovereign immunity pursuant to the Foreign Sovereign Immunities Act of 1976 ("FSIA"). *See* 28 U.S.C. § 1604. As a result of Libya's immunity from suit, victims were unable to pursue claims directly against Libya in United States courts. Appellants paid approximately $42 million in insurance claims resulting from the destruction of EgyptAir Flight 648 and approximately $55 million under their respective insurance contracts to the estates and families of Americans and foreign nationals killed in the Pan Am Flight 103 bombing.

In 1996, however, Congress enacted the State Sponsors of Terrorism Exception to FSIA ("Terrorism Exception"), 28 U.S.C. § 1605(a)(7) (1996), *repealed by* Pub. L. 110-181, Div. A, § 1083(b)(1)(A)(iii), Jan. 28, 2008, 122

Stat. 341. The Terrorism Exception stripped sovereign immunity for "money damages . . . sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act . . . is engaged in by an official, employee, or agent of such foreign state . . . ." *Id.* Because the Department of State had previously designated Libya a state sponsor of terrorism as of December 29, 1979, Libya became susceptible to suit for wrongful death and personal injuries as a result of its sponsored terrorist activities, including the EgyptAir Flight 648 and Pan Am Flight 103 attacks.

Following passage of the Terrorism Exception, Appellants filed suits in the United States District Court for the District of Columbia, asserting their insurance subrogation rights and seeking, inter alia, damages for the personal injury and wrongful death claims they paid under their contracts and insurance policies as a result of the EgyptAir Flight 648 and Pan Am Flight 103 attacks. *See Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, No. 1:98-CV-03096 (D.D.C. filed Dec. 18, 1998) ("*Pan Am*"); *Certain Underwriters at Lloyds London v. Socialist People's Libyan Arab Jamahiriya*, No. 1:06-cv-00731 (D.D.C. filed Apr. 21, 2006) ("*EgyptAir*"). On January 28, 2008, President Bush signed the National Defense Authorization Act of 2008, Pub. L. No. 110-181, § 1083, which replaced Section 28 U.S.C. § 1605(a)(7) (the Terrorism Exception) with 28 U.S.C. § 1605A. This Section additionally allowed claims for property damage resulting from terrorism to be brought against a state sponsor of terrorism. As a result, Appellants amended their complaints, additionally asserting property damage claims against Libya pursuant to § 1605A.

While Appellants' claims were pending, however, President Bush negotiated a settlement with Libya whereby the United States agreed to terminate all pend-

ing lawsuits against Libya. In exchange, Libya paid the U.S. Government $1.5 billion to ensure payment to victims with claims against Libya. Pursuant to the settlement, Congress passed the Libyan Claims Resolution Act ("LCRA"). *See* Pub. L. No. 110-301, 122 Stat. 2999 (2008). Sections 5(a)(1)(A) and (B) of the LCRA provide that Libya "shall not be subject to the exceptions to immunity from jurisdiction" under the Terrorism Exception under FSIA and that any "private right of action relating to acts by a state sponsor of terrorism arising under Federal, State, or foreign law shall not apply with respect to claims against Libya . . . in any action in a Federal or State court."

Subsequently, President Bush signed Executive Order No. 13,477, providing further that "[a]ny pending suit in any court, domestic or foreign, by United States nationals . . . coming within the terms of Article I [of the Libya Claims Settlement Agreement] shall be terminated" and also that "[a]ny pending suit in any court in the United States by foreign nationals . . . coming within the terms of Article I [of the Libya Claims Settlement Agreement] shall be terminated." Executive Order No. 13,477, 73 Fed. Reg. 65,965 (Oct. 31, 2008). Pursuant to the Executive Order, the State Department referred certain U.S. nationals' claims against Libya to the Foreign Claims Settlement Commission ("Commission") that was funded by the $1.5 billion payment from Libya. The Executive Order did not direct the State Department to refer claims by foreign companies to the Commission; rather, it provided that with respect to suits by foreign nationals "[n]either the dismissal of the lawsuit, nor anything in this order, shall affect the ability of any foreign national to pursue other available remedies for claims . . . in foreign courts or through the efforts of foreign governments." *Id.*

Citing the LCRA and the President's Executive Order, the Government moved to dismiss Appellants' claims for

lack of subject matter jurisdiction. The district court dismissed Appellants' claims, holding that "[b]ecause the LCRA, Settlement Agreement, and Executive Order specifically and comprehensively withdraw any exception to sovereign immunity that may be provided in the FSIA with regard to [Libya's] pre-2006 support of terrorist acts, this Court lacks subject matter jurisdiction over the Libyan Defendants." *Certain Underwriters at Lloyds London v. Great Socialist People's Libyan Arab Jamahiriya*, 677 F. Supp. 2d 270, 275 (D.D.C. 2010).

Thereafter, some of the Appellants in this case submitted claims with the Commission for damages resulting from the Pan Am attack, but each claim was denied because of the Commission's "continuous nationality" jurisdictional rule requiring that claimants be U.S. nationals from the date of injury to the date of the espousal of their claims by the United States. Because of this rule, Appellants Certain Underwriters, Aviation & General, Aureus, and Riverstone did not submit claims for losses accruing from the EgyptAir Flight 648 attack because they and their insured are foreign nationals. Although Appellant New York Marine, a U.S. national, submitted a claim, the Commission concluded that it lacked jurisdiction because its insured, EgyptAir, was a foreign national. The Commission also denied claims alleging jurisdiction based on the subrogation interest of Pan Am, a U.S. corporation, because despite Pan Am's nationality, the claim belonged to a foreign national at the time it accrued.

Appellants then filed complaints in the Court of Federal Claims, alleging that the Government took their property without just compensation in violation of the Fifth Amendment. Specifically, Appellants alleged that "the United States took the property of [Appellants] in the form of their legally cognizable Foreign Sovereign Immunities Act claims against [Libya]" for its role in the destruction of EgyptAir Flight 648 and the Pan Am Flight 103

attack. J.A. 983 ¶¶ 1–2. Appellants further alleged that "[t]he United States' actions in furtherance of restoring 'normal' relations with Libya directly resulted in the taking of Plaintiffs' judicially cognizable claims against Libya" and that "[t]he United States has deprived [Appellants] of their property, the lawsuits against Libya, without any remedy in either federal court or the [Commission]." J.A. 983–984 ¶¶ 1–2, 998 ¶ 58.

The Government initially moved to dismiss for failure to state a claim and on the ground that the case involved a nonjusticiable political question—namely, the President's authority to settle their claims with Libya. The Court of Federal Claims denied the Government's motion, reasoning that Appellants do not question the President's authority to conduct foreign relations, but rather seek compensation for their terminated claims and the United States' decision to exclude them from the settlement proceeds. *See Aviation & Gen. Ins. Co. v. United States*, 121 Fed. Cl. 357, 366 (2015) ("*Motion to Dismiss Order*").

After concluding that Appellants' claims did not present a nonjusticiable political question, the Court of Federal Claims granted summary judgment in the Government's favor. *See Aviation & Gen. Ins. Co. v. United States*, 127 Fed. Cl. 316 (2016) ("*Summary Judgment Order*"). The court determined that, while Appellants had a property interest in their lawsuits against Libya, no taking had occurred under the factors set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). *See Summary Judgment Order*, 127 Fed. Cl. at 319 (citing *Penn Central*, 438 U.S. at 124). Specifically, the court found that Appellants "cannot claim an investment-backed expectation free of government involvement nor can they characterize the Government's action as novel or unexpected" because Presidents have a longstanding practice of settling and espousing claims against foreign sovereigns. *Id.* at 319–20. The court also emphasized the speculative nature of Appellants' econom-

ic injury, explaining that "it is skeptical that Plaintiffs would have been able to collect on [any] judgment" against Libya. *Id.* at 320. The court concluded that, as a result, "the [Appellants'] economic injury is not one that fairness and justice require be shifted to the public at large." *Id.*

Appellants appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Court of Federal Claims' grant of summary judgment de novo, *see Northwest Title Agency, Inc. v. United States*, 855 F.3d 1344, 1347 (Fed. Cir. 2017) (citing *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1336 (Fed. Cir. 2006)), applying the same standard as the trial court, *Palahnuk v. United States*, 475 F.3d 1380, 1382 (Fed. Cir. 2007). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Northwest*, 855 F.3d at 1347 (citing *Castle v. United States*, 301 F.3d 1328, 1336 (Fed. Cir. 2002)). We also review the Court of Federal Claims' decision on justiciability de novo. *See Glass v. United States*, 258 F.3d 1349, 1355 (Fed. Cir. 2001).

## I.

We first address the justiciability of Appellants' claims.[1] In their complaints, Appellants alleged that "the

---

[1] Appellants argue that the Government only raised justiciability in its motion to dismiss and did not raise the issue on summary judgment, which is the subject of this appeal. We reject Appellants' waiver argument. The Court of Federal Claims addressed justiciability in its decision denying the Government's motion to dismiss and,

United States took the property of [Appellants] *in the form of their legally cognizable . . . claims* against the government of Libya" for its role in the EgyptAir Flight 648 and Pan Am Flight 103 terrorist attacks and that they were "deprived . . . of their property, *the lawsuit[s] against Libya*, without any remedy in either federal court or the Foreign Claims Settlement Commission." J.A. 970 ¶ 1, 979 ¶ 39, 983 ¶ 1, 998 ¶ 58 (emphases added). During the litigation below and on appeal, however, Appellants shifted their argument, asserting that they "do not allege that the sale of their claims to Libya was a taking, but are challenging [the Government's] decision to exclude them from the distribution of [the Libya Claims Settlement Agreement] proceeds." Appellants' Br. 26. Appellants' arguments are thus twofold: (1) they had a property right in their lawsuits against Libya, which the Government took without just compensation, and (2) they were entitled to proceeds under the Libya Claims Settlement Agreement.

The Government argues that both of these arguments present a nonjusticiable political question as Appellants "attempt to second-guess the President's authority to settle [their] claims . . . ." Appellee's Br. 53. Specifically, the Government argues that (1) "[t]he President's authority for the settlement agreement with Libya . . . is a quintessential example of the exercise of the President's broad constitutional powers in foreign affairs" that this court cannot address; and (2) Appellants "challenge[] the Executive Branch's implementation of the settlement with Libya—that is, the decision not to make provision for them under that settlement," which would require judicial inquiry into the President's enforcement of the settlement

---

accordingly, the Government may raise the issue as an alternative ground for affirmance.

agreement with Libya. *Id.* at 53, 54. We hold that the question of whether a Fifth Amendment taking of Appellants' alleged property right in their lawsuits occurred presents a justiciable claim, but the question of whether Appellants were entitled to proceeds from the Libya Claims Settlement Agreement presents a nonjusticiable political question.

"The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). Although distinct from jurisdiction, the political question doctrine bars our review of issues implicating questions committed to coordinate political departments. *See Roth v. United States*, 378 F.3d 1371, 1385 (Fed. Cir. 2004) ("Even if a court possesses jurisdiction to hear a claim, when that claim presents a nonjusticiable controversy, the court may nevertheless be prevented from asserting its jurisdiction.").

The Supreme Court has articulated various formulations of what constitutes a political question depending on the circumstances of the case and what may "identify it as essentially a function of the separation of powers." *Baker*, 369 U.S. at 217. As the Court explained in *Baker*:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of

embarrassment from multifarious pronounce-
ments by various departments on one question.

*Id.*

The claims in Appellants' complaints regarding the
Government's termination of their lawsuits against Libya
state a justiciable takings claim. These claims do not
cause us to question the terms of the Libya Claims Set-
tlement Agreement itself, whether the President had
authority to enter the settlement, or whether the Presi-
dent should have made provision for Appellants in the
distribution of its proceeds. Rather, these claims require
us to examine whether, under the Fifth Amendment, a
taking occurred by the Government's espousal of Appel-
lants' claims and termination of their lawsuits by rein-
stating Libya's sovereign immunity. This is a *legal*
question for which we have judicially discoverable and
manageable standards for resolution. *See id.*

We hold, however, that to the extent Appellants seek
judicial review of the President's decision to exclude them
from the settlement's proceeds, Appellants raise a nonjus-
ticiable political question. We have identified similar
questions as nonjusticiable political questions. In *Belk v.
United States*, 858 F.2d 706, 710 (Fed. Cir. 1988), we
addressed claims brought by the released victims of the
Iranian hostage crisis. The United States had settled
their claims by signing agreements (the Algiers Accords)
with Iran. *See id.* at 707. The victims sued the Govern-
ment, alleging a taking in violation of the Fifth Amend-
ment and seeking the full amount of damages they would
have recovered against Iran had their claims not been
settled. *Id.* There, we found the case presented a nonjus-
ticiable question because the appellants questioned
whether the President should have sought better terms in
the settlement agreement. We held that "[t]he determi-
nation whether and upon what terms to settle the dispute
with Iran . . . necessarily was for the President to make in

his foreign relations role." *Id.* at 710. We concluded that the appellants' claims were not appropriate for judicial resolution because "judicial inquiry into whether the President could have extracted a more favorable settlement would seriously interfere with the President's ability to conduct foreign relations." *Id.*

We hold that Appellants' claims directed to their exclusion from the distribution of proceeds arising from the Libya Claims Settlement Agreement present a similar nonjusticiable political question. As Appellants concede, *see* Appellants' Reply Br. 26, foreign relations and settlements to resolve foreign conflicts are soundly committed to the President's discretion. *See Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government . . . ." (citation omitted)). It follows that the President had complete discretion and authority to implement the settlement with Libya and to decide to whom the settlement funds would be distributed. Appellants' argument that they should have been included in the distribution of settlement funds questions the President's policy decision to exclude them. The President's policy decision regarding the settlement proceeds is not a determination for judicial resolution. It is a question "'of a kind clearly for nonjudicial discretion,' and there are no 'judicially discoverable and manageable standards' for reviewing such a Presidential decision." *Belk*, 858 F.2d at 710 (quoting *Baker*, 369 U.S. at 217). "The Judiciary is particularly ill suited to make such decisions, as 'courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.'" *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Thus, we do not reach Appellants' arguments regarding their exclusion from the settlement proceeds. We only address their

alleged claims that termination of their lawsuits against Libya constituted a taking under the Fifth Amendment.

## II.

The Fifth Amendment states that private property shall not be taken "for public use, without just compensation." U.S. Const. amend. V. To state a claim for a taking, Appellants must establish that they had a cognizable property interest and that their property was taken by the United States for a public purpose. *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009). We assume, without deciding, that Appellants' lawsuits against Libya constituted a cognizable property interest for purposes of a takings claim. We hold, however, that even if Appellants had a property interest in their lawsuits, no taking occurred under the Fifth Amendment.

The parties agree that, under the circumstances in this case, whether a taking occurred requires analysis of the factors set forth in *Penn Central*. The *Penn Central* factors query: (1) "the character of the governmental action"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "[t]he economic impact of the regulation on the claimant." *Penn Central*, 438 U.S. at 124. In *Belk*, under facts similar to this case, we provided an explication of these factors to reflect the unusual circumstances of these types of cases, including:

> the degree to which the property owner's rights were impaired, the extent to which the property owner is an incidental beneficiary of the governmental action, the importance of the public interest to be served, whether the exercise of governmental power can be characterized as novel and unexpected or falling within traditional boundaries, and whether the action substituted any rights or remedies for those that it destroyed.

*Belk*, 858 F.2d at 709. All relevant factors must be weighed to decide whether a compensable taking has occurred. *Id.* In the end, we must determine whether "'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central*, 438 U.S. at 124.

We start with the first *Penn Central* factor—the character of the Government's action. "In deciding whether a particular governmental action has effected a taking, this Court focuses . . . both on the character of the action and on the nature and extent of the interference with rights . . . as a whole." *Penn Central*, 438 U.S. at 130–31. As we noted in *Belk*, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Belk*, 858 F.2d at 709 (quoting *Penn Central*, 438 U.S. at 124). The character of governmental action in this case is the Government's authority to settle and espouse claims and reinstate Libya's sovereign immunity. While we recognize the significant degree to which the Appellants' rights in maintaining their lawsuits were impaired—indeed, their lawsuits were terminated—the Government's action nonetheless was not a physical invasion of Appellants' property rights. Rather, the Government reinstated Libya's sovereign immunity for the common good, reflecting the "current political realities and relationship[]" between the United States and Libya. *Republic of Iraq v. Beaty*, 556 U.S. 848, 864 (2009) (citation omitted); *see also Belk*, 858 F.2d at 709 ("Here there was no physical invasion of property, but only the prohibition on the assertion by the appellants of their alleged damage claims . . . .").

Turning to the second *Penn Central* factor—interference with investment-backed expectations—

Appellants argue that they "had reasonable investment backed expectations, at the time of their investment, in receiving some compensation for the termination of their claims . . . ." Appellants' Br. 34. Appellants assert that in "looking back" at all historical examples of foreign claims settlements, claimants either received compensation upon termination of their lawsuits or otherwise directly benefited from the settlement itself. *Id.* at 32–33. Appellants note that, in contrast, they received no such compensation or benefit. Appellants further assert that the Government "failed to provide an alternative remedy to Plaintiffs *specifically* to gain a government benefit at their expense, the ability to pay more to" United States citizens. *Id.* at 34 (emphasis in original).

After considering Appellants' arguments, we agree with the Court of Federal Claims that the Government's action in changing the status of Libya's sovereign immunity was neither novel nor unexpected and thus could not have interfered with Appellants' reasonable investment-backed expectations. As the court recognized, since at least 1799, the United States, as a matter of foreign relations, has settled claims against foreign sovereigns as such litigious activity is a "source[] of friction" in our international relations. *See Summary Judgment Order*, 127 Fed. Cl. at 320 (quoting *United States v. Pink*, 315 U.S. 203, 225 (1942)). "Foreign sovereign immunity 'reflects current political realities and relationships,' and its availability (or lack thereof) generally is not something on which parties can rely 'in shaping their primary conduct.'" *Beaty*, 556 U.S. at 864–65 (citation omitted). "[T]he United States has repeatedly exercised its sovereign authority to settle the claims of its nationals against foreign countries . . . by executive agreement[s] . . . [u]nder [which] the President has agreed to renounce or extinguish claims of United States nationals against foreign governments in return for lump-sum payments or the establishment of arbitration procedures." *Belk*, 858

F.2d at 709 (alterations in original) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981)). We conclude that Appellants could not have reasonably expected that their lawsuits against Libya would be free from governmental interference. Indeed, even Appellants concede that "there was always a possibility [the Government] would interfere in [their] litigation against Libya . . . ." Appellants' Br. 23.

Appellants' argument that they nonetheless held a reasonable expectation of compensation following the Government's termination of their claims based on historical examples is of no moment. As we have held, the President's decision to exclude Appellants from the distribution of proceeds from this particular settlement is not a justiciable issue that this court can address. Moreover, we disagree that at the time Appellants invested in their insurance contracts or at the time of the terrorist attacks—the time at which Appellants' claims accrued—Appellants had an expectation of being compensated for the claims they paid as a result of the attacks. At those times, Libya had sovereign immunity from suit in the United States. Thus, the Government's *ex post facto* abrogation of Libya's sovereign immunity could not have interfered with any reasonable expectation that Appellants could sue Libya at the time their claims accrued. *Cf. Beaty*, 556 U.S. at 865 (emphasis in original) ("Iraq was immune from suit at the time it is alleged to have harmed respondents. The President's elimination of Iraq's *later* subjection to suit could hardly have deprived respondents of any expectation they held at the time of their injury that they would be able to sue Iraq in United States courts."). Indeed, Appellants' ability to file a lawsuit against Libya was only made possible years after the attacks in 1996, when Congress temporarily lifted Libya's sovereign immunity pursuant to the Terrorism Exception to FSIA.

Moreover, even if, as Appellants argue, they held a reasonable investment-backed expectation at the time Congress lifted Libya's sovereign immunity, they could not have reasonably expected that the Government would not eventually change its position and interfere in their lawsuits. Surely, if Congress giveth, so too can it taketh away. After Congress fortuitously lifted Libya's immunity from suit, permitting Appellants' lawsuits in the first instance, Appellants should have reasonably foreseen that Congress could also reinstate Libya's sovereign immunity. As occurred here, Congress altered the jurisdictional rule of sovereign immunity with respect to Libya *after* Libya's conduct giving rise to Appellants' claims. After the President exercised his authority to settle claims against Libya, Congress again altered the rules of sovereign immunity reinstating Libya's sovereign immunity. Given the evident changing political climate between the United States and Libya during this time, it was unreasonable for Appellants to have expected that the waiver of Libya's sovereign immunity would have remained static while their lawsuits were pending. Thus, we agree that the Government's action did not constitute a novel interference with Appellants' investment-backed expectations.

Additionally, we disagree with Appellants' characterization that the Government failed to provide an alternative forum to litigate their claims against Libya. While the settlement and consequent legislation did not provide Appellants (as foreign nationals) a forum in the United States, the President's Executive Order expressly provided that with respect to suits by foreign nationals "[n]either the dismissal of the lawsuit, nor anything in this order, shall affect the ability of any foreign national to pursue other available remedies for claims coming within the terms of Article I [of the Libya Claims Settlement Agreement] in foreign courts or through the efforts of foreign governments." Executive Order No. 13,477, 73 Fed. Reg. 65,965. Thus, Appellants could have sought

relief in foreign courts but chose not to do so. Appellants' failure to seek relief in a foreign forum should not be a cost shouldered by the American public.

Regarding the third *Penn Central* factor—economic impact—we agree with the Court of Federal Claims that the economic impact is speculative and uncertain. As with any litigation, there was no guarantee that Appellants would have been successful in obtaining a judgment, let alone successful in enforcing that judgment against Libya. *See, e.g., United States v. Sperry*, 493 U.S. 52, 63 (1989) ("Had the President not agreed to the establishment of the [Iran-United States Claims] Tribunal and the Security Account, [Plaintiff] would have had no assurance that it could have pursued its action against Iran to judgment or that a judgment would have been readily collectible.").

Both at oral argument and in a supplemental letter to the court, Appellants' counsel touted his experience in obtaining and enforcing judgments against the assets of state sponsors of terrorism. This anecdotal evidence, however, finds no support in the record. Nor is it relevant to the facts of this case. The extent to which counsel may have recovered from foreign governments in other cases does not establish a definitive value of Appellants' pending claims at the time of their termination; nor does it provide assurance that Appellants would have obtained and enforced a judgment against Libya.

Finally, though not dispositive, we emphasize the importance of the public interest and policy considerations served by the Government's action. The President's action in settling claims against Libya was designed to normalize relations between the United States and Libya, restore international comity, and promote international commerce. Moreover, the President's decision to espouse these claims implicates important policy decisions soundly committed to the President. To find that a taking

occurred under these circumstances would interfere with the President's authority to enter into foreign claims settlements for the benefit of United States foreign relations and may interfere with the structure of future settlements.

After balancing the pertinent considerations under *Penn Central*, we conclude that, on the undisputed facts of this case, Appellants have not stated a cause of action for a taking based on the United States' termination of their lawsuits pursuant to the Libya Claims Settlement Agreement. The Court of Federal Claims did not err in granting summary judgment.

## CONCLUSION

In sum, we hold that applying the relevant *Penn Central* factors to the facts of this case, "justice and fairness" counsel against finding that the Government's termination of Appellants' claims effected a taking under the Fifth Amendment. Accordingly, we affirm.

## **AFFIRMED**

### COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**AVIATION & GENERAL INSURANCE COMPANY,
LTD., NEW YORK MARINE AND GENERAL
INSURANCE COMPANY, CERTAIN
UNDERWRITERS AT LLOYDS LONDON, AUREUS
ASSET MANAGERS, LTD., RIVERSTONE
INSURANCE (UK), LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2016-2389, 2016-2402

---

Appeals from the United States Court of Federal Claims in Nos. 1:14-cv-00687-TCW, 1:14-cv-00703-TCW, Judge Thomas C. Wheeler.

---

REYNA, *Circuit Judge*, concurring-in-part and dissenting-in-part.

I concur with the majority opinion that affirms the Court of Federal Claims' grant of summary judgment. I write to state a distinct basis by which I would affirm the grant of summary judgment: that Appellants have no right of action against the U.S. government based on subrogated interests derived from insurance claims paid in relation to the Libya-sponsored terrorist attacks. I

respectfully disagree, however, with the majority view that the U.S. Government's termination of all U.S. suits against Libya presents a justiciable question. Accordingly, I respectfully concur-in-part and dissent-in-part.

BACKGROUND

On November 23, 1985, Libyan-sponsored terrorists hijacked EgyptAir Flight 648 ("EgyptAir") in an event that resulted in loss of lives and the destruction of the aircraft. On December 21, 1988, Libyan-sponsored terrorists bombed Pan Am Flight 103 ("Pan Am") over Lockerbie, Scotland, causing the disintegration of the aircraft and loss of lives of all passengers and crew members.

Appellants are insurance companies and an asset management company that provided insurance and/or reinsurance for property damage to aircrafts, and liability insurance covering passengers of the airlines. Except for New York Marine and General Insurance Company ("NY Marine"), all appellants are foreign entities. Appellants paid out on insurance contracts that covered the EgyptAir and Pan Am events. For claims related to EgyptAir, the Egyptian airline insured the aircraft hull for about $14 million through an Egyptian insurance company, MISR Insurance Company. The aircraft was destroyed in the terrorist attack, and Appellants together paid reinsurance coverage of about 75.55% of the $14 million amount.

For claims related to Pan Am, the U.S. airline insured the aircraft hull and obtained liability insurance for bodily injury (including death) to its passengers arising out of airline operations. Appellants Aviation & General Insurance Company, Ltd. ("Aviation") and Certain Underwriters at Lloyds London ("Lloyds"), both UK entities, provided portions of the insurance. The Pan Am bombing resulted in the death of all passengers and the destruction of the aircraft. Appellants claim to have paid approximately $55 million to Pan Am for the airplane hull and

the claims brought by families of the U.S. and foreign nationals that perished in the Pan Am bombing.[1]

At the time of the terrorist attacks, the Foreign Sovereign Immunities Act of 1976 prohibited suits in U.S. courts brought against other countries, with certain exceptions. *See* 28 U.S.C. § 1604; *see also id.* §§ 1605–07 (providing exceptions). One exception stripped a foreign state of immunity in any U.S. suit arising from certain acts of terrorism that occurred when the state was designated a sponsor of terrorism. In 1996, Congress designated Libya a sponsor of terrorism, a political act that lifted sovereign immunity protection for Libya for state sponsored terrorism acts. *See* 28 U.S.C. § 1605(a)(7) (repealed Pub. L. 110-181, Div. A, § 1083(b)(1)(A)(iii), Jan. 28, 2008, 122 Stat. 341).

In 1998 and 2006, Appellants filed suits against the Libyan government in the United States District Court for the District of Columbia.[2] Among other things, Appellants plead standing on the basis of insurance subrogation rights, seeking damages for insurance claims they paid as a result of the EgyptAir and Pan Am attacks.

In 2008, while the lawsuits were pending, the U.S. Government engaged in a process to normalize relations with Libya. Congress passed the Libyan Claims Resolution Act ("LCRA"), Pub. L. No. 110-301, 122 Stat. 2999

---

[1] NY Marine, the sole U.S. entity, was not a party in the Pan Am claims.

[2] *See Certain Underwriters at Lloyds London v. Socialist People's Libyan Arab Jamahiriya*, No. 1:06-cv-00731(GK) (D.D.C. filed Apr. 21, 2006) (EgyptAir claims); *Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, No. 1:98-cv-03096 (TFH) (D.D.C. filed Dec. 18, 1998) (Pan Am claims).

(2008), restoring Libya's sovereign immunity and implementing the Libya Claims Settlement Agreement ("LCSA"). Pursuant to those Congressional legislative acts, President Bush signed an Executive Order terminating all pending U.S. suits against Libya related to the EgyptAir and Pan Am terrorism attacks. *See* Executive Order No. 13,477, Fed. Reg. 65,965 (Oct. 31, 2008) ("Executive Order"). Pursuant to the LCRA, LCSA, and the Executive Order, the district court dismissed Appellants' suits for lack of jurisdiction.[3]

After the termination of the lawsuits, the State Department referred U.S. nationals' claims against Libya to the Foreign Claims Settlement Commission ("FCSC"), a settlement program funded by Libya in an approximate amount of $1.5 billion. NY Marine, the sole U.S. Appellant in the instant appeal, submitted claims to the FCSC alleging a subrogated interest as reinsurer in losses arising from the destruction of the airplane hull in the EgyptAir attack. The FCSC denied the claims because of a "continuous nationality" jurisdictional rule requiring that all relevant parties in the chain of insurance (including insurers, reinsurers, and the insured) must be U.S. nationals from the date of injury to the date the U.S. lawsuits were terminated under the Executive Order. Although NY Marine, the reinsurer, was a U.S. national, it is undisputed that both the insured, EgyptAir, and the insurer, MISR Insurance Company, were foreign nationals.

The other Appellants, all foreign entities, did not submit EgyptAir-related claims with the FCSC. Appellants Aviation and Lloyds, both foreign nationals, submit-

---

[3]  *Certain Underwriters at Lloyds London v. Great Socialist People's Libyan Arab Jamahiriya*, 677 F. Supp. 2d 270, 275 (D.D.C. 2010).

ted Pan Am-related claims with the FCSC, alleging a subrogated interest in the claims of their insured, Pan Am, for losses arising from the Pan Am bombing. The FCSC rejected those claims, despite Pan Am's U.S. nationality, on grounds that the insurers were foreign nationals at the time the terrorist attacks took place.[4]

In 2014, Appellants filed suit against the U.S. Government in the Court of Federal Claims, alleging that the U.S. settlement with Libya, the termination of all U.S. suits against Libya, and the denial of compensation from the settlement funds constituted a taking under the Fifth Amendment.

The U.S. Government initially moved to dismiss on grounds that the case involves a nonjusticiable political question. The Court of Federal Claims denied the U.S. Government's motion reasoning that Appellants do not question the President's authority to conduct foreign relations, but rather seek compensation for their terminated claims and their exclusion from the settlement proceeds. The Court of Federal Claims granted summary judgment in favor of the U.S. Government, finding that

---

[4] The FCSC found that:

[F]or purposes of the continuous nationality requirement, and as noted in numerous prior international law decisions, an insurer bringing a claim as a subrogee does not adopt the nationality of its insured, the subrogor. Instead, the insurer must independently—and in addition to the insured—meet the continuous nationality requirement.

J.A. 518. It is undisputed that Appellants Aviation and Lloyds are foreign nationals.

while Appellants had a property interest in their lawsuits against Libya, no taking had occurred. *See Aviation & Gen. Ins. Co. v. United States*, 127 Fed. Cl. 316 (Fed. Cl. 2016) ("*Summary Judgment Order*").

Appellants appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2012).

DISCUSSION

I.  STANDING

Appellants do not allege that they were directly injured by the U.S. Government. Appellants predicate their claims against the U.S. Government on their rights as "subrogees to the claims of victims of Libyan terrorism." J.A. 140. Appellants claim to be "entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy." J.A. 140.

I believe that Appellants' claims should be rejected for lack of standing.[5] It is well established that subrogation is a common law doctrine based in equity that permits an insurer to take the place of the insured to pursue recovery from third-party tortfeasors responsible for the insured's loss. *Subrogation*, Black's Law Dictionary (9th ed. 2009). What this means is that when an insurance company

---

[5]    It is well-established that any party, including the court sua sponte, can raise the issue of standing for the first time at any stage of the litigation, including on appeal. *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 230 (1990) (issue of standing raised sua sponte on appeal by the Supreme Court); *see Pandrol USA, LP v. Airboss Ry. Prod., Inc.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003). Although the parties did not argue standing, I sua sponte raise this important issue.

pays an insured for property damage or physical injury, the insurance company steps into the shoes of the insured and can bring suit against a third party (e.g., a tortfeasor) to recover damages caused to the insured. The insurance company's subrogated interest is limited by whatever restrictions would have applied against the insured had the insured itself brought the action against the tortfeasor.

Aside from equitable subrogation, a subrogation right may be expressly created by contract or statute. The right of subrogation, however, cannot be contractually enlarged beyond what is granted in equity. *See, e.g., Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 957 (9th Cir. 2013). As noted above, an important limit to the right of subrogation is that it is a purely derivative right, and "a subrogee takes no more rights than its subrogor had." *United States v. California*, 507 U.S. 746, 747 (1993).

It is undisputed that EgyptAir and Pan Am airlines could not maintain suits against Libya in U.S. courts after Congress passed the LCRA and the President signed the Executive Order. LCRA expressly provides that

> [A]ny other private right of action relating to acts by a state sponsor of terrorism arising under Federal, State, or foreign law shall not apply with respect to claims against Libya, or any of its agencies, instrumentalities, officials, employees, or agents in any action in a Federal or State court.

Pub. L. No. 110-301, 122 Stat. 2999 (2008). The Executive Order provides that "[a]ny pending suit in any court, domestic or foreign, by United States nationals . . . coming within the terms of Article I [of the LCSA] shall be terminated" and that "[a]ny pending suit in any court in the United States by foreign nationals . . . coming within the terms of Article I [of the LCSA] shall be terminated." Executive Order No. 13,477, Fed. Reg. 65,965. If the

insureds, EgyptAir and Pan Am airlines, could not sue Libya, and by extension the U.S. Government, there is no (subrogated) legal basis on which the insurer and reinsurers can seek recovery against Libya or the U.S. Government. Given that EgyptAir and Pan Am have no claim in U.S. courts against Libya or the U.S. Government, their insurers also have no such claim.

Similarly, Appellants wrongly base their claims related to the Pan Am bombing on their "subrogated interest in the payments made to the insured as a result of the deaths of everyone on board Pan Am Flight 103." J.A. 140. Here, the insured is Pan Am, not the victims. Appellants have no subrogated interest that accrued from the claims of the victims who perished in the Pan Am bombing. As the FCSC found, Appellants "would only be subrogated to the claims of the party they insured, Pan Am. The victims, in contrast, were third parties who brought suit against the Pan Am Subrogees' [*i.e.*, Appellants'] insured, [the] Pan Am [airline]." J.A. 551.

Appellants' claims are further limited by the terms of a settlement agreement between Pan Am and the victims' claimants that included a release wherein the right to bring suit against Libya was reserved, which they in fact did in the *Rein* litigation. *See Rein v. Socialist People's Libyan Arab Jamahiriya*, No. 9:96-cv-02077 (E.D.N.Y. filed Apr. 29, 1996). Pan Am and its insurers did not become subrogated to the claims asserted in *Rein*.[6]

---

[6] The releases between Pan Am, Appellants and the victims include the following language:

> All parties to this release reserve any and all rights they have against foreign states, including but not limited to Libya, Syria and/or Iran, and their employees, agents and assets in connection

Because neither Appellants nor Pan Am possess a subrogated interest in the victim claims against Libya, neither can sue the U.S. Government on behalf of the victims.

Assuming Appellants have a subrogated interest in the claims of the Pan Am victims, they do not necessarily have a cause of action against the U.S. Government. As Appellants acknowledge, *see* Appellants Br. 11, the victims of the Pan Am attack settled their claims against Libya and were compensated pursuant to the LCSA, not as a result of a suit against Libya. Thus, it follows that Appellants cannot overstep the rights of the insured to bring claims against the U.S. Government, where the victims themselves did not have a claim against the U.S. Government. If an insurer believes that an insured has been unjustly enriched by receiving both insurance policy payout from the insurer and compensation from the tortfeasor, the insurer may pursue a subrogation claim against the insured. But that is not the case here.

Appellants' claims against the U.S. Government fail for a separate reason. Courts have generally interpreted that, in the context of insurance claims, the insurer's claim against a third party based on a subrogated interests is limited to actual tortfeasors. *See Md. Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 210 (2d Cir. 2000) (affirming that "the subrogation doctrine 'applies only against tortfeasors'" and that permitting subrogation against a non-tortfeasor third party insurer "would violate fundamental principles of restitution or unjust enrichment law on which the doctrine of subrogation rests" (citation omitted)); *Wendy's Int'l, Inc. v. Karsko*, 94 F.3d

---

with the perpetration of an aircraft bombing of Pan Am Flight 103, on December 21, 1988.

J.A. 558.

1010, 1014 (6th Cir. 1996) (holding that an equitable right of subrogation was limited to tortfeasors and dismissing plaintiff's claim); *Commercial Union Ins. Co. v. Bituminous Cas. Corp.*, 851 F.2d 98, 100–01 (3d Cir. 1988) (holding that the principle of subrogation is inapplicable where the third party is not responsible for the loss); *Bogart v. Twin City Fire Ins. Co.*, 473 F.2d 619, 629 (5th Cir. 1973) (holding that an insurance carrier's right of subrogation "has been recognized only in actions involving a tortfeasor").

Both the Restatement of Restitution and treatises on this topic support this interpretation. For example, the Restatement defines the right of subrogation to apply "[w]here property of one person is used in discharging an obligation owed by another . . . under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred." Restatement (First) of Restitution § 162 (1937). Similarly, Palmer's treatise on restitution indicates that an "insurance company's subrogation rights extend no further than is necessary to prevent unjust enrichment of the insured[,]" and warns that "[s]ubrogation cannot be used as a legal mechanic whereby one person is substituted to another's cause of action against a third person." Palmer, Law of Restitution §§ 23.11, 23.13 (1978); *see* 16 Couch on Ins. § 224:113 (Subrogation right is limited to true tortfeasors.).

Here, the U.S. Government is not the tortfeasor in the EgyptAir and Pan Am attacks. The extent of the U.S. involvement in Appellants' claims is limited to actions taken by the Congressional and Executive branches years *after* the terrorist attacks.[7] Appellants do not allege, nor

---

[7] The only actions that Appellants allege against the Government are those related to the restoration of relations with Libya: Congress passed the Libyan Claims

does the record indicate, that the U.S. Government was in any way responsible for the Libya attacks, or that it has otherwise been unjustly enriched. Courts have held that "[t]he American government should not be held as a surrogate for [another nation's] unjustifiable actions." *Belk v. United States*, 12 Cl. Ct. 732, 735 (1987), *aff'd*, 858 F.2d 706 (Fed. Cir. 1988); *see Abrahim-Youri v. United States*, 36 Fed. Cl. 482, 487 (1996), *aff'd*, 139 F.3d 1462 (Fed. Cir. 1997) ("The property losses that plaintiffs suffered were occasioned by Iran, not the United States."). Thus, the doctrine of subrogation would apply to Libya, the state sponsor of terrorists, or perhaps the terrorists themselves, but not the U.S. Government.[8]

For these reasons, I conclude that Appellants have no standing against the U.S. Government for a Fifth Amendment takings claim arising from the Libya attacks.

---

Resolution Act ("LCRA") restoring Libya's sovereign immunity, and the President signed the Libya Claims Settlement Agreement ("LCSA") and the Executive Order No. 13,477 ("Executive Order") terminating all pending claims against Libya.

[8] This court has held that the doctrine of subrogation for claims against the U.S. Government applies only in limited circumstances involving government contracts. *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001) ("[A] surety may succeed to the contractual rights of a contractor against the government: when the surety takes over contract performance or when it finances completion of the defaulted contract."). Appellants do not allege any contractual relationship between the insured and the U.S. Government in this case.

## II.     JUSTICIABILITY

Appellants assert that the U.S. Government's termination of their pending claims against Libya and its decision to deny them compensation from the LCSA fund constituted a taking of property in violation of the Fifth Amendment. The U.S. Government argues that Appellants' claims present nonjusticiable political questions. I agree.

The majority holds that Appellants' claims that are directed to their exclusion from the distribution of LCSA settlement funds present a nonjusticiable issue. Maj. Op. at 10. I agree. The U.S. Government historically has possessed wide latitude to settle the legal claims of its nationals against foreign governments in the interests of American foreign policy. *See Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government."). I agree with my colleagues' reasoning that "the President had complete discretion and authority to implement the settlement with Libya and to whom the settlement funds would be distributed" and that "[t]he President's policy decision regarding the settlement funds is not a determination for judicial resolution." Maj. Op. at 12.

The majority however, also holds that "[t]he claims in Appellants' complaints regarding the Government's termination of their lawsuits against Libya state a justiciable takings claim." Maj. Op. at 11. I disagree.

My colleagues explain that:

These claims do not cause us to question the terms of the Libya Claims Settlement Agreement itself, whether the President had authority to enter the settlement, or whether the President should have made provision for Appellants in the

distribution of its funds. Rather, these claims require us to examine whether, under the Fifth Amendment, a taking occurred by the Government's espousal of Appellants' claims and termination of their lawsuits by reinstating Libya's sovereign immunity. This is a legal question for which we have judicially discoverable and manageable standards for resolution.

*Id.* at 11. My colleagues rely on *Baker v. Carr*, 369 U.S. 186 (1962), in which the Supreme Court outlined six independent criteria for determining whether courts should defer to the political branches on an issue:

Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. The majority finds that claims regarding termination of suits against Libya are justiciable under the second *Baker* criterion; "a legal question for which we have judicially discoverable and manageable standards for resolution." Maj. Op. at 11. However, this does not end the justiciability inquiry. *Baker* outlined six separate criteria for justiciability, and any single one may be grounds for finding nonjusticiability.

The LCRA, LCSA, and the Executive Order all demonstrate a commitment to Congress and the President to manage the international affairs of the country. The Supreme Court has long acknowledged the U.S. Government's singular authority specifically with respect to legal claims against foreign states. *Dames & Moore*, 453 U.S. 654, 679–80 (1981) ("[T]he United States has repeatedly exercised its sovereign authority to settle the claims of its nationals against foreign countries."). This authority has been well established. *Shanghai Power Co. v. United States*, 4 Cl. Ct. 237, 244 (1983); *aff'd*, 765 F.2d 159 (Fed. Cir. 1985) ("Our Presidents have exercised the power to settle international claims of U.S. nationals at least since 1799.").

Here, the U.S. Government's termination of all suits is part and parcel of the U.S. Government's political process involving a belligerent nation, Libya. The U.S. Government's effort to restore relations with Libya is a legitimate U.S. policy objective aimed at addressing not only foreign relations, but also in combatting international acts of terrorism. Here, the political branches of the U.S. Government worked in concert towards this objective. Congress passed the LCRA to restore Libya's sovereign immunity, which provides that "any other private right of action relating to acts by a state sponsor of terrorism arising under Federal, State, or foreign law shall not apply with respect to claims against Libya, or any of its agencies, instrumentalities, officials, employees, or agents in any action in a Federal or State court." Pub. L. No. 110-301, 122 Stat. 2999. Subsequently, the President signed the Executive Order providing that "[a]ny pending suit in any court, domestic or foreign, by United States nationals . . . coming within the terms of Article I [of the Libya Claims Settlement Agreement] shall be terminated" and also that "[a]ny pending suit in any court in the United States by foreign nationals . . . coming within the terms of Article I [of the Libya Claims Settlement Agree-

ment] shall be terminated." Executive Order No. 13,477, Fed. Reg. 65,965. I do not think it is possible to address Appellants' claim without involving U.S. Government policy decisions and directives of a kind clearly for nonjudicial discretion.

In my view, the case for nonjusticiability of claims based on the termination of Appellants' suits is stronger than the case of nonjusticiability on the question involving distribution of LCSA funds. While only the executive branch was involved in the fund's distribution, the termination of the suits was born of concerted actions by both Congress and the Executive branch.

The majority opinion would permit suits against the U.S. Government that are based on the termination of lawsuits against Libya. Such a question would necessarily involve second guessing the acts of the President and Congress, and undermine their negotiating authority to resolve conflicts with foreign nations.

In addition, as this case demonstrates, permitting takings claims against the U.S. Government in matters such as this would shift significant liability from the vaults of foreign wrongdoers to the backs of American taxpayers, a burden that could easily run into billions of dollars, per event.[9]

---

[9] For example, multiple multi-million-dollar judgments have been entered against Iran alone under the terrorism exception. *See, e.g.*, *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 138 (D.D.C. 2001) (awarding over $316 million); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 29–30, 40 (D.D.C. 2001) (awarding over $314 million); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 30–31, 53 (D.D.C. 2001) (awarding over $353 million).

There is a lack of fundamental fairness in requiring U.S. taxpayers to pay potentially large awards for terrorist acts perpetrated by foreign state sponsored terrorism, especially when the attacks happen overseas and the parties bringing the actions are foreign entities. *See Belk*, 858 F.2d at 706 ("The American government should not be held as a surrogate for [another nation's] unjustifiable actions."); *Abrahim-Youri*, 139 F.3d at 1462 (same). Indeed, the Executive Order does not foreclose foreign insurers from pursuing their claims in other countries.[10] Thus, while I agree with my colleagues that "Appellants' failure to seek relief in a foreign forum should not be a cost shouldered by the American public," I see this as more a political question involving U.S. Government policy, than a mere legal consideration. Maj. Op. at 18.

Entertaining Appellants' takings claims risks upsetting decades of settled law and would materially interfere with the U.S. Government's constitutional prerogative in foreign relations. The U.S. Government's authority to negotiate with belligerent nations, including state sponsors of terrorism, is a matter of foreign relations, and, as here, one of national security. The courts should not interfere in this business. These are political questions that have no resolution in U.S. courts.

Because the Constitution commits foreign relations matters to the U.S. Government's political branches, I

---

[10] The President's Executive Order provided that with respect to suits by foreign nationals "[n]either the dismissal of the lawsuit, nor anything in this order, shall effect the ability of any foreign national to pursue other available remedies for claims coming within the terms of Article I [of the Libya Claims Settlement Agreement] in foreign courts or through the efforts of foreign governments." Executive Order No. 13,477, Fed. Reg. 65,965.

would find that all of Appellants' takings claims present nonjusticiable political questions.  The court has no role in shaping and elaborating the international policy of the country.  "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker*, 369 U.S. at 210.

## CONCLUSION

For these reasons, I would affirm the summary judgment by the Court of Federal Claims, but would hold that the court is precluded from considering Appellants' Fifth Amendment takings claim on the basis that those claims presents a nonjusticiable political question.